UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAFAYETTE DESHAWN
UPSHAW,

               Petitioner,                      Case No. 20-cv-12560
                                                  Honorable Linda V. Parker

v.

GEORGE STEPHENSON,

               Respondent.
_____/

## OPINION AND ORDER GRANTING PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner, Lafayette Deshawn Upshaw, is currently serving between twenty and forty-two years in state prison for a conviction arising from a May 28, 2014 armed robbery.  Two witnesses were available to testify that Upshaw was at home during the robbery; however, his trial attorneys failed to investigate and call them at trial.  Claiming that his Sixth Amendment rights were violated due to counsel's ineffectiveness, as well as other errors in the proceedings, Upshaw filed an application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 in September 2020.  (ECF No. 1.)  On May 2, 2022, the Court granted summary judgment in favor of Upshaw on one of his claims and ordered that an evidentiary hearing be held with respect to two others.  (ECF No. 19.)  That hearing was held on May 17, 2022.

For the reasons set forth below and in its previous opinion and order (ECF No. 19), the Court is granting Upshaw's Petition as to three of his claims. As already discussed in the Court's May 2 decision, and as Respondent concedes, Upshaw's Sixth Amendment rights were violated when the trial court used facts not found by the jury when calculating the sentencing guidelines. As also discussed in that decision, and will be further discussed below, the State court unreasonably assessed the facts when evaluating whether Upshaw's two trial attorneys were ineffective in failing to investigate and present alibi witnesses. Two individuals had evidence that, when placed in context with judicially noticeable facts, indicated that Upshaw was at home when the armed robbery occurred. Upshaw repeatedly tried to get his attorneys to raise an alibi defense. Yet trial counsel failed to investigate and/or present Upshaw's alibi witnesses despite the fact that there was no strategic reason for failing to do so. Finally, the State court unreasonably applied Supreme Court precedent when rejecting Upshaw's claim that the prosecution exercised peremptory challenges based on race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

## I.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides the standard of review applicable to Upshaw's application for habeas relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)

A state-court decision satisfies the "contrary to" clause if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  Likewise,

[a] state-court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," [*Williams*, 529 U.S.] at 407-08 . . . or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context," *Seymour v. Walker*, 224 F.3d 542, 549 (6th Cir.2000).

*Murphy v. Ohio*, 551 F.3d 485, 494 (6th Cir. 2009).  The Supreme Court has cautioned, however, that "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011).  Thus, where, as here, "a claim has been adjudicated on the merits by a state court, a

federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.*

Finally, with respect to the "unreasonable determination" clause, 28 U.S.C. § 2254(d)(2)

> the question . . . "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 . . . (2007). . . . [And] "the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

*Hill v. Shoop*, 11 F.4th 373, 384 (6th Cir. 2021); *see also* 28 U.S.C. § 2254(e)(1) (explaining that "determination[s] of . . . factual issue[s] made by a State court shall be presumed to be correct" but that "th[is] presumption of correctness [can be rebutted] by clear and convincing evidence").

In conducting the § 2254(d) analysis, courts must be mindful "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102 (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). Rather, under AEDPA, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

4

## II.   <u>Revisiting the Court's May 2 Decision</u>

The Court finds it necessary to address two issues before proceeding further with its analysis of Upshaw's claims.  First, in a supplemental brief filed after the evidentiary hearing, Respondent argues that the Court erred by "redetermine[ing] whether a state rule was properly applied" in relation to the affidavit of one of Upshaw's alibi witnesses.  (ECF No. 24 at Pg ID 1640.)  While the Court did indicate in its May 2 decision that the affidavit satisfied the requirements of Michigan Court Rule 2.119(B)(1), contrary to the Michigan Court of Appeals' conclusion, that did not factor into the Court's conclusion that the State court's analysis of Upshaw's ineffective assistance claim was unreasonable.  Instead, it was the State court's factual determination that the witness's statement did not contain certain information that this Court found objectively unreasonable because the statement *did* contain that information.  (ECF No. 19 at Pg ID 1522.)  Stated differently, this Court was not communicating that the Michigan Court of Appeals' interpretation or application of state law was "unreasonable"—as that term is used in § 2254(d).  (*See* ECF No. 19 at Pg ID 1522.)  Instead, what the Court found objectively unreasonable, as contemplated in the habeas statute, was the State court's *reading of the witness' statement*.  (*Id*.); *see also* 28 U.S.C. § 2254(d)(2) (providing for the grant of habeas relief where the State court's adjudication of a

claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings").

Next, as will be discussed more fully below, even without the evidence from the May 17 evidentiary hearing, and even when viewed under AEDPA's deferential standard of review, the Court concludes that Upshaw is entitled to habeas relief. Based only on the record before the Michigan courts, it is clear that the State courts unreasonably adjudicated Upshaw's ineffective assistance of counsel and *Batson* claims.

## III.   Background

### A.   Upshaw's Convictions and Sentence

Shortly after 8:00 a.m. on May 28, 2014, Upshaw and Darrell Miles Walker "were arrested in the process of committing a home invasion at a residence" located at 19475 Washburn Street in Detroit, Michigan. (ECF No. 6-9 at Pg ID 623; ECF No. 6-14 at Pg ID 863.) They "were caught as they exited separate windows of the house," from which they "had attempted to steal several items of jewelry." (ECF No. 6-14 at Pg ID 863.) Upshaw was charged with second-degree home invasion in violation of Michigan Compiled Laws § 750.110a(3); larceny in a building in violation of Michigan Compiled Laws § 750.360; and resisting and obstructing in violation of Michigan Compiled Laws § 750.81d(1). (ECF No. 6-6 at Pg ID 327.)

6

Several hours before Upshaw and Walker were arrested, an armed robbery occurred at 1920 West Fischer Service Drive, a gas station approximately ten miles south of the invaded home.[1]  (ECF No. 6-2 at Pg ID 231-32; ECF No. 6-14 at Pg ID 862-63.)  Tina Williams was the only employee working at the time.  (ECF No. 6-8, Pg ID 523.)  She reported that around 3:30 a.m., just after she had returned to her bullet-proof cashier booth from attempting to help a strangely behaving man with the gas station's coffee machine, another man entered the station and robbed a female customer at gunpoint.  (ECF No. 6-14 at Pg ID 863.)

The second man, whose face was obstructed by a t-shirt, then demanded that Williams give him the money in the cash register.  (*Id.*; ECF No. 6-8 at Pg ID 489-90.)  When Williams refused, the man tried to kick open the door of the cashier booth and fired several shots in her direction, which were blocked by the bullet-proof glass.  (ECF No. 6-14 at Pg ID 863.)  The first man "shouted at her to open the access door, indicating that . . . [she] should do so in order to simply end the situation and get [the shooter] out of the gas station," but Williams "stood her ground and did not comply."  (*Id.*)  The shooter eventually "gave up and ran out of the gas station."  (*Id.*)  After the altercation, the first man, who had remained at the

---

[1] The distance between the house and the gas station is a fact of which the Court may take judicial notice.  *See Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir. 2017); *see also, e.g.*, *Hund v. Hund*, No. 334313, 2017 Mich. App. LEXIS 1082, at *14 (Mich. Ct. App. July 6, 2017) (taking judicial notice of distance and extrapolating travel time).

coffee machine and had not run when the shooter's gun was pointed in his direction, approached the booth and told Williams that she should call the police. (*Id.*)  He "then fled in the same direction as the shooter."  (*Id.*)

A few days later, Williams identified Walker as the coffee machine man and Upshaw as the shooter in separate photographic lineups.  (*Id.*; ECF No. 6-8 at Pg ID 500-04.)  Upshaw thereafter was charged with five additional crimes: armed robbery in violation of Michigan Compiled Laws § 750.529; carrying a dangerous weapon with unlawful intent in violation of Michigan Compiled Laws § 750.226; possession of a firearm during the commission of a felony ("felony-firearm") in violation of Michigan Compiled Laws § 750.227b; assault with intent to commit murder in violation of Michigan Compiled Laws § 750.83; and assault with intent to do great bodily harm less than murder in violation of Michigan Compiled Laws § 750.84.  (ECF No. 6-2 at Pg ID 229.)

Upshaw ultimately pleaded guilty to second-degree home invasion but elected to go to trial on the gas station robbery charges.  (ECF No. 6-7 at Pg ID 340-41; ECF No. 6-11 at Pg ID 757.)  He was tried jointly with Walker before the Honorable Michael J. Callahan in Wayne County Circuit Court.  (*See, e.g.*, ECF No. 6-7 at Pg ID 329.)  A week before trial, during an October 2, 2014 pre-trial conference, Upshaw requested an adjournment.  (ECF No. 6-5 at Pg ID 322.)  He explained to the trial judge that he was dissatisfied with his attorney, Ray Paige,

who failed to appear at an August 5, 2014 conference,[2] and had just retained a new

attorney, Wright Blake, who was present at the conference.  (ECF No. 6-4 at Pg ID

314-15; ECF No. 6-5 at Pg ID 322.)  The full colloquy proceeded as follows:

> MR. BLAKE: And we're going to talk some more.  Mr. Upshaw
> wants an adjournment.  He doesn't feel that we're quite ready.  I told
> him that I would bring myself up to speed by the time for the trial
> date.  Is that correct, Mr. Upshaw?
>
> MR. UPSHAW: Yes, but as you can see, your Honor, I have retained
> a new lawyer because of my insufficient counsel for not showing up
> and not coming and telling me the information.  So I feel like my
> lawyer hasn't, my lawyer hasn't saw the DVD.  He hasn't retained
> the transcript or anything and I feel like it's best grounds of
> adjournment right there, your Honor, just to get him caught up on
> what's going on with the case cause I just retained him like a week
> and a half ago, probably not even that.
>
> THE COURT: Well, I'm not granting an adjournment at this point.
> We'll see what happens. Okay.
>
> MR. BLAKE: Thank you, your Honor.

(ECF No. 6-5 at Pg ID 321-22.)

The trial began on October 9, 2014 and lasted three days.  (*See* ECF No. 6-1

at Pg ID 225.)  On October 16, 2014, the jury found Upshaw guilty of armed

robbery, carrying a dangerous weapon with unlawful intent, and felony-firearm.

(ECF No. 6-10 at Pg ID 743.)  He was acquitted of the assault charges.  (*Id.*)

---

[2] In a letter to the Michigan Attorney Grievance Commission, Upshaw's mother, Toya Green, stated that Paige had, in fact, failed to appear on *four* separate occasions.  (ECF No. 6-14 at Pg ID 950.)

9

On November 14, 2014, the trial court sentenced Upshaw to prison for two years for felony-firearm followed by concurrent terms of eighteen to forty years for armed robbery, one to five years for carrying a dangerous weapon, and one to fifteen years for second-degree home invasion.  (ECF No. 6-11 at Pg ID 756-57.)

### B.     Upshaw's State Appellate and Post-Conviction Efforts

On December 17, 2014, Upshaw commenced an appeal as of right through counsel.  (ECF No. 6-14 at Pg ID 905.)  Upshaw raised several claims, including denial of his Sixth Amendment right to the effective assistance of counsel due to trial counsel's failure to investigate potential alibi witnesses, file the required notice to present an alibi defense, and present alibi witnesses.  (*Id.* at 975.) Upshaw also moved to remand for an evidentiary hearing pursuant to Michigan Court Rule 7.211(C)(1) and *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973). (ECF No. 6-14 at Pg ID 895-96.)

In support, Upshaw provided an affidavit in which he stated:

. . . on May 28, 2014, at about 3:30 a.m., a co-worker dropped me off at my home, where my aunt (Crystal Holloway) let me in, and along with my grandmother (Joann Holloway), along with my significant other (Diamond Woods), all heard me preparing a meal in the kitchen of the home before I went to bed.

I was never at, or near[,] the Mobil gas station located at 1920 West Fischer Drive.  Neither was I with Darrell Walker in that early morning, until around 7:30-7:45 a.m., due to the fact I caught the bus to go help someone move, and saw him along the bus ride and which we did a criminal act along the way.  The information above is true, and are facts that need to be established, due to my attorney lacking

10

adequate information and time to prepare my defense.  I had nothing
to do with an armed robbery, nor did I have any knowledge of one.

(*Id.* at 897 (capitalization omitted).)  Also attached was an affidavit from Upshaw's

co-defendant, Walker, in which Walker stated that Upshaw was not at the gas

station with him and that Walker went to the gas station alone.  (*Id.* at 898.)  On

May 6, 2015, the Court of Appeals denied Upshaw's Motion to Remand.  (*Id.* at

894.)

With the assistance of newly retained appellate counsel, Upshaw filed a

successive motion to remand and moved for leave to file a supplemental brief on

January 25, 2016.  (*Id.* at 912-14.)  In support of the motion to remand, Upshaw

attached a new affidavit that he signed, along with notarized statements from his

grandmother, JoAnn Green, and his aunt, Crystal Holloway.  (*Id.* at 878-84.)  In

her statement, Holloway averred:

I was a [sic] alibi witness to some events that happened on May [sic].
[Upshaw's] lawyer knew about me being a witness but he choose [sic]
not to call on me to give my testimony. . . . I am writing this letter in
hopes that [Upshaw] will be granted a new trial in which he will be
able to have his witness called to the stand to testify on his behalf.

(*Id.* at 882.)

Green's affidavit provided Upshaw an alibi for the time immediately

preceding the robbery, suggested that Upshaw did not leave the home until 7:45

a.m. that day, and described with particularity why Green remembered the details

of that night.  Green wrote, in part, that she lived with her children and Upshaw

and on May 28, 2014:

> I know Shawn . . . could not have been anywhere else, because at
> between 3:20 and 3:30 he was getting blessed out by me[.]  [H]e'd
> woke me again.  I'd been watching one of my programs and fell
> asleep[.]  I woke up from the knock on the door[,] look at the tv set
> the time on the cable box[,] that's why I know he couldn't be in too
> [sic] places at a time[.]  I was mad after seeing what time it was and I
> let (Shawn) Lafayette Upshaw know it to[o], later when he left at
> around 7:45, I was still upset, sitting on my front porch didn't want a
> kiss or say love you.

(ECF No. 6-14 at Pg ID 884.)

The Michigan Court of Appeals denied Upshaw's successive motion to

remand, holding that Upshaw failed to "demonstrate[] that further factual

development of the record or an initial ruling by the trial court [was] necessary."

(*Id.* at 874.)[3]  Nevertheless, the court of appeals permitted the filing of a

supplemental brief.  (*Id.* at 911.)  As relevant here, Upshaw argued in the

supplemental brief that "the trial court abused its discretion when it denied [his]

request for a brief adjournment" and that "[he] was denied a fair trial and due

process of law [because] the prosecutor improperly dismissed minority venire

members" and gave "insufficient [race-neutral reasons] to avoid a finding of

purposeful discrimination."  (*Id.* at 927, 930 (capitalization omitted).)

---

[3] Presiding Judge Cynthia Diane Stephens disagreed and would have granted the
motion to remand. (*Id.*)

On May 19, 2016, the Michigan Court of Appeals rejected all of Upshaw's arguments and affirmed his convictions and sentence. *People v. Walker*, Nos. 324672, 325195, 2016 WL 2942215 (Mich. Ct. App. May 19, 2016).  On April 4, 2017, the Michigan Supreme Court denied leave to appeal.  *People v. Upshaw*, 891 N.W.2d 487 (Mich. 2017)  The United States Supreme Court denied Upshaw's petition for the writ of certiorari on November 6, 2017.  *Upshaw v. Michigan*, 138 S. Ct. 422 (2017).

On July 10, 2018, Upshaw filed a pro se motion for relief from judgment. (ECF No. 6-12 at Pg ID 760.)  In it, he argued, among other things, that his Sixth Amendment rights were violated by the trial court's use of judicially found facts to score offense variables one, four, and nine (which increased his mandatory minimum sentence and guidelines range), as well as his appellate counsel's failure to raise this issue; and that the Michigan Court of Appeals unreasonably applied the Supreme Court's precedent in *Batson v. Kentucky*, 476 U.S. 79 (1986), in violation of the Fourteenth Amendment.  (*Id.* at 796, 806.)  On November 27, 2018, the Honorable Wanda A. Evans (to whom the case was reassigned following Judge Callahan's retirement) denied Upshaw's motion.  (ECF No. 6-13 at Pg ID 855; *see also* ECF No. 6-1 at Pg ID 225.)  Both the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal.  (ECF No. 6-15 at Pg ID 1057; ECF No. 6-17 at Pg ID 1316.)

## C.     Upshaw's Habeas Petition (ECF No. 1)

On September 18, 2020, Upshaw filed the current federal habeas petition. (ECF No. 1.)  Upshaw raises seven grounds for relief in his petition: (1) that his "trial counsel was constitutionally ineffective for failing to investigate potential alibi witnesses and failing to file an alibi notice;" (2) that "the trial court denied [his] motion for a brief adjournment . . . in violation of due process;" (3) that "the prosecutor dismissed African-American potential jurors in a discriminatory manner, in violation of the Equal Protection Clause;" (4) that "the trial court found facts that were not found by the jury to score offense variable 14, which increased the mandatory minimum sentence, in violation of the Sixth and Fourteenth Amendments;" (5) that "appellate counsel was constitutionally ineffective for failing to request a 'Crosby remand' as the remedy for [the offense variable 14] claim;" (6) that "the trial court found facts that were not found by the jury to score offense variables 1, 4, and 9, which increased the mandatory minimum sentence, in violation of the Sixth and Fourteenth Amendments, and [that] appellate counsel was constitutionally ineffective for failing to raise this claim on direct appeal;" and (7) that "trial and appellate counsel were constitutionally ineffective for failing to argue that prior record variable 5 was [inappropriately] []scored."  (Id. at Pg ID 6-11 (capitalization omitted).)

On May 2, 2022, this Court granted summary judgment in favor of Upshaw on claim six; found claims four, five, and seven moot in light of the relief appropriate for claim six; and ordered an evidentiary hearing on claims one and two. (ECF No. 19.) With respect to claim one, the Court concluded that the State court's adjudication of the claim involved an unreasonable application of *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984), as well as an unreasonable determination of the facts. (*Id.* at Pg ID 1520.) The Court therefore held that Upshaw had overcome the limitation of § 2254(d)(1) and that AEDPA deference is inappropriate as to that claim. (*Id.* at Pg ID 1530.)

The evidentiary hearing was held on May 17, 2022. (ECF No. 23.) Three witnesses testified: Upshaw, Blake, and Holloway. (*See id.* at Pg ID 1548.)

### D.    Evidentiary Hearing

#### 1)    Upshaw's and Holloway's Testimony

After getting off work at Tony's Bar and Grill in the early morning of May 28, 2014, Upshaw received a ride home from his manager, Jeffrey Haugabook. (*Id.* at Pg ID 1555.) Upshaw needed a ride because, at the time, he had no car or bike, and relied exclusively on public transportation and ridesharing to get around. (*Id.* at Pg ID 1555-56.) Upshaw did not have his keys with him when he arrived home around 3:25 a.m., so he knocked on the front door. (*Id.* at Pg ID 1556.)

Holloway, who suffers from insomnia, heard the knocking from her bedroom upstairs and let him in. (*Id.* at Pg ID 1555, 1613-14.)

Upshaw's knocking also woke up Green, who was sleeping on the couch downstairs. (*Id.* at Pg ID 1583, 1614-15.) Green was very angry with Upshaw for waking her up and spent several minutes yelling at him. (*Id.* at Pg ID 1583, 1608.) Eventually, Upshaw went upstairs and began to attend to his infant daughter, who had been awakened by the commotion. (*Id.* at Pg ID 1583-84, 1609, 1612.) Holloway, who also went upstairs, was in and out of her bedroom for about twenty or thirty minutes, during which time she spoke with Upshaw and heard him playing with his daughter. (*Id.* at Pg ID 1583-84, 1615.)

Diamond Woods, the mother of Upshaw's daughter, was with Upshaw as well. (*Id.* at Pg ID 1615, 1619.) Holloway retired to her room for the night "a little before 4:00 [a.m.]." (*Id.* at Pg ID 1615.) At some point, Upshaw went downstairs to make something to eat. (*Id.* at Pg ID 1583.) He then returned to his room, which he shared with Woods, and went to sleep. (*Id.* at Pg ID 1584.) The next morning, Upshaw awoke around 6:30 or 7:00 and left the house shortly thereafter. (*Id.* at 1585.) Green was awake and sitting downstairs when he left. (*Id.* at Pg ID 1585.)

After being charged with the armed robbery of the gas station, Upshaw retained Ray Paige to represent him at trial. (*Id.* at Pg ID 1572.) At their first

meeting, Upshaw informed Paige that he had been at home with his baby, Green,

Holloway, and Woods at the time of the robbery and that the three women were

willing to serve as alibi witnesses.  (*Id.* at Pg ID 1562, 1565, 1572-73.)  At no point

during the following months, however, did Paige try to contact them.  (*Id.* at Pg ID

1562-63, 1565, 1610, 1621.)  This total failure to investigate, combined with

Paige's poor communication and absence at certain pre-trial proceedings, proved

too much for Upshaw.  (*Id.* at Pg ID 1564.)  Accordingly, he replaced Paige with

another attorney, Wright Blake, about two weeks before trial.  (*Id.* at Pg ID 1566.)

Despite the little time remaining before trial, Blake waited nearly a week to meet

with Upshaw and failed to familiarize himself with the facts of Upshaw's case

beforehand.  (*Id.* at Pg ID 1566-67, 1573.)

      At their first meeting, eight days before trial, Upshaw told Blake that he was

home at the time of the gas station robbery and that Green, Holloway, and Woods

were prepared to testify at trial to his alibi.  (*Id.*)  Upshaw also gave Blake their

contact information.  (*Id.* at Pg ID 1568.)  Blake, who primarily used the meeting

to review Upshaw's discovery packet for the first time, offered no response and

took no notes.  (*Id.* at Pg ID 1566-67, 1574.)

      The next day, Blake told Upshaw that he had missed the deadline to call

alibi witnesses.  (*Id.* at Pg ID 1576-77.)  Nevertheless, Blake declined to make any

arguments at the pre-trial conference in support of Upshaw's plea for an

adjournment and, instead, told the trial court that he could be prepared for trial the following week.  (*Id.* at Pg ID 1566-67; ECF No. 6-5 at Pg ID 321-22.)  Blake did not meet with Upshaw again before trial and did not contact Holloway.  (*Id.* at Pg ID 1575-76, 1610.)

Green, Holloway, and Woods spoke with Upshaw "[m]ultiple times" about serving as alibi witnesses and even attempted to reach out to Blake.  (*Id.* at Pg ID 1579-80.)  Blake, however, called none of these individuals to testify—though all attended the trial.  (*Id.* at Pg ID 1580.)  Blake ultimately called only one witness, Haugabook.  (*Id.* at Pg ID 1576.)  Haugabook, however, did not offer an alibi. (ECF No. 6-9 at Pg ID 671.)

From Upshaw's perspective, Blake "just winged the whole case." (ECF No. 23 at Pg ID 1577.)  At every opportunity, even as the trial wore on, Upshaw renewed his pleas for Blake to call his alibi witnesses.  (*Id.* at Pg ID 1575.)  But Blake repeatedly insisted that he could do nothing because he had missed the alibi witness deadline.  (*Id.*)

### 2.   *Blake's Testimony*

Blake remembered very little of Upshaw's case and had no records pertaining to his representation of Upshaw.  (*Id.* at Pg ID 1596.)[4]  Blake recalled

---

[4] Blake stated that "[he] always take[s] notes," but admitted that he is "not a very good notetaker." (ECF No. 23 at Pg ID 1604-05.)

that the trial took place in 2014, that the charges involved a gas station, and that there was a video.  (*Id.* at Pg ID 1595-96.)  But that was about it.  (*Id.* at Pg ID 1598-99.)  He did not recall how many weeks before trial he had been retained, whether he met with Upshaw more than once before trial, whether he had been informed of the existence of alibi witnesses, whether he contacted any of those witnesses, or how much time he spent preparing for trial.  (*Id.* at Pg ID 1596-98.) Despite these numerous lapses in memory, Blake was "sure" that he was adequately prepared for Upshaw's trial.  (*Id.* at Pg ID 1597.)

The Court's confidence in Blake's credibility was seriously diminished, however, by his inconsistent statements and complete lack of preparation—or attempt to prepare—for the evidentiary hearing.  For example, Blake initially claimed that no one, except possibly the Attorney General's office, contacted him about the evidentiary hearing, and that he did not know why he was being called to testify until he looked up the docket.  (*Id.* at Pg ID 1601.)  He later recalled, however, that Upshaw's habeas counsel contacted him via email before subpoenaing him and that he responded.  (*Id.* at 1602.)  Similarly, Blake claimed that he was "sure" he would have requested an adjournment if he was retained so soon before trial.  (*Id.* at Pg ID 1605.)  Yet, at the October 2, 2014 pre-trial

conference, he did not do so.  (ECF No. 6-5 at Pg ID 321-22.) [5]

In addition, Blake declined to review (or even request) any materials from the record to prepare to give testimony, save for the register of actions, despite the fact that he could recall almost nothing related to his representation of Upshaw and knew that the evidentiary hearing would focus on that representation.  (*Id.* at Pg ID 1598, 1601.)  Against this backdrop, the Court does not find credible Blake's claim that he would have asked the trial court for an adjournment if he was provided alibi witnesses past the time to file an alibi notice.  (*Id.* at Pg ID 1599.)

## IV.   <u>Analysis</u>

### A.   **Trial Counsel's Failure to Investigate and Call Alibi Witnesses to Testify at Trial (Claim I)**

In his first claim, Upshaw argues that his "trial counsel was constitutionally ineffective for failing to investigate potential alibi witnesses and failing to file an alibi notice."  (ECF No. 1 at Pg ID 6 (capitalization omitted).)

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the effective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668, 685-86 (1984).  To prove ineffective assistance of

---

[5] Although Blake no longer remembers how soon before trial he joined the case, he does not dispute Upshaw's claim that it was two weeks.  (ECF No. 23 at Pg ID 1568, 1604.)  The Court also notes that at the October 2, 2014 pre-trial conference, where Blake declined to argue for an adjournment, he did not disagree with Upshaw's statement that he had been retained "a week and a half ago, probably not even that."  (ECF No. 6-5 at Pg ID 322.)

counsel, Upshaw must satisfy *Strickland*'s familiar two-prong test. *See, e.g.*,

*Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

> The first prong assesses counsel's performance. Under this prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. In other words, a court assessing an ineffective assistance claim must "determine whether, in light of all the circumstances, the challenged acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. When making this assessment, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*
>
> Second, in order to amount to a constitutional violation, the error by counsel must have been prejudicial to the defendant. *Id.* at 691-92. To prove prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "The question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111-12.

*Stermer v. Warren*, 959 F.3d 704, 736 (6th Cir. 2020) (brackets omitted).

Before turning to the proper application of *Strickland*, the Court makes the

following factual findings as to the handling of Upshaw's case by Paige and Blake.

These findings are based upon the Court's careful review of the record evidence as

well as its consideration of the testimony adduced at the evidentiary hearing.

21

Upshaw, with the assistance of his mother and Green, retained Paige in June or July 2014. (ECF No. 6-2 at Pg ID 227; ECF No. 6-14 at Pg ID 950; ECF No. 23 at Pg ID 1565, 1572, 1620.) The two women took responsibility for corresponding with Paige. (ECF No. 6-14 at Pg ID 950; ECF No. 23 at Pg ID 1620.) At their very first attorney-client meeting, Upshaw told Paige that he was innocent and that Green, Holloway, and Woods could provide alibi testimony. (ECF No. 23 at Pg ID 1562, 1565, 1572-73.) Paige, however, did not contact Holloway, and likely did not contact Woods. (*Id.* at Pg ID 1562-63, 1610, 1621.) Paige may have spoken to Green on one occasion, but he did not pursue her alibi testimony. (*Id.* at Pg ID 1562-63; ECF No. 6-14 at Pg ID 884.) At no time during the next two months did Paige file an alibi notice. (ECF No. 23 at Pg ID 1577.) In addition, Paige failed to appear for at least one, and possibly multiple, proceedings. (ECF No. 6-1 at Pg ID 225; ECF No. 6-4 at Pg ID 314-15; ECF No. 6-5 at Pg ID 322; ECF No. 6-14 at Pg ID 950; ECF No. 23 at Pg ID 1564.)

Approximately two weeks before trial, Upshaw, again with the help of his mother and Green, retained Blake to replace Paige. (ECF No. 6-5 at Pg ID 322; ECF No. 6-14 at Pg ID 950; ECF No. 23 at Pg ID 1566.) Although time was of the essence, Blake waited until eight days before trial to meet with Upshaw and did not begin familiarizing himself with the case materials until that first attorney-client meeting. (ECF No. 23 at Pg ID 1566-67, 1573.) During that meeting, Upshaw

told Blake that he had been home at the time of the robbery and that Green, Holloway, and Woods were prepared to testify to his alibi at trial. [6] (*Id.*)  Upshaw also provided their contact information.  (*Id.* at Pg ID 1568; ECF No. 6-14 at Pg ID 950.)  Blake, however, used the meeting to review Upshaw's discovery packet, which he had not obtained the previous week, and did not discuss Upshaw's alibi. (ECF No. 23 at Pg ID 1566-67, 1574.)

The next day, Blake told Upshaw that he missed the deadline to call alibi witnesses and, at the pre-trial conference, declined to make any arguments in support of Upshaw's plea for an adjournment.  (*Id.* at Pg ID 1566-67, 1576-77; ECF No. 6-5 at Pg ID 321-22.)  Blake made no attempt to seek an extension of the alibi-witness deadline.  He instead told the trial court that he could be prepared for trial by the following week.  (ECF No. 6-5 at Pg ID 322).  That was the last time Upshaw saw Blake before trial.  (ECF No. 23 at Pg ID 1575-76.)  And although Green reached out to Blake on behalf of herself, Holloway, and Woods, Blake did

---

[6] Respondent argues that Upshaw's testimony should not be believed because it is "self-serving."  (ECF No. 24 at Pg ID 1636.)  This argument is unpersuasive, however.  *See Hodges v. Colson*, 727 F.3d 517, 538 (6th Cir. 2013) (en banc) (quoting *Miller v. Straub*, 299 F.3d 570, 581 (6th Cir. 2002)) (explaining that "testimony, though self-serving, may be enough by itself to satisfy [Strickland's] prejudice prong").  Upshaw and Holloway were both very credible at the hearing. Their testimony, in combination with Green's notarized letter, lead the Court to find that Upshaw told Paige and Blake that he had an alibi defense and witnesses to back it up.  Significantly, Blake never claimed that he was not informed of Upshaw's alibi witnesses but stated that he "did not remember."

not attempt to file an alibi notice, did not investigate Holloway if not also Green and Woods, and ultimately called none of the women to testify.  (*Id.* at Pg ID 1580, 1610; ECF No. 6-14 at Pg ID 884.)  At every opportunity, Upshaw renewed his pleas for Blake to call alibi witnesses, but Blake insisted that he could do nothing because he had missed the deadline.  (*Id.* at Pg ID 1575.)

### 1)    Performance

"Under *Strickland*, trial counsel has a duty to investigate his case[.]" *Stewart v. Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2006).  "This duty includes the obligation to investigate *all witnesses* who may have information concerning . . . [a] client's guilt or innocence."  *Id.* (quoting *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005)) (emphasis added).  In this case, it was objectively unreasonable for Paige to neither contact nor investigate Holloway after Upshaw informed him at their initial meeting that she was a potential alibi witness.[7]  *Id.*; *see also, e.g.*, *McQueen v. Winn*, No. 19-2212, 2020 U.S. App. LEXIS 14373, at *17 (6th Cir. May 5, 2020) (citing *Towns*, 395 F.3d at 258; *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004)) ("An attorney is . . . ineffective when he or she fails to investigate potential alibi witnesses.").  Likewise, it was objectively unreasonable

---

[7] Although it seems likely that Paige also failed to investigate Green and Woods, the Court bases its decision specifically on Holloway because her testimony at the evidentiary hearing was highly credible and based on personal knowledge.  (ECF No. 23 at Pg ID 1610 ("I can't speak for my mother, but he didn't contact me.").

for Blake to fail to undertake *any* investigation into Upshaw's case until eight days before trial, after the deadline for filing an alibi notice had passed.  *See Williams v. Taylor*, 529 U.S. 362, 395 (2000) (failure to begin mitigation investigation until a week before trial was unreasonable); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (citation omitted) (requiring "a *prompt* investigation") (emphasis added).  Blake, who testified that he has  tried "thousands" of cases, knew or should have known that Michigan law requires a defendant to file an alibi notice at least ten days before trial, and should have moved quickly to ascertain whether Upshaw had an alibi.  (ECF No. 23 at Pg ID 1599); Mich. Comp. Laws § 768.20(1); *see Clinkscale*, 375 F.3d at 443 (citations omitted) (noting that "a number of courts have found ineffective assistance of counsel in violation of the Sixth Amendment where . . . a defendant's trial counsel fails to file a timely alibi notice and/or fails adequately to investigate potential alibi witnesses").

Even assuming that Blake's late addition to the case hindered his ability to timely discover Upshaw's alibi defense, Blake's failure to attempt to remedy the situation is independently sufficient to constitute ineffective assistance of counsel. *See Bigelow v. Williams*, 367 F.3d 562, 570-71 (6th Cir. 2004) (citing *Matthews v. Abramajtys*, 319 F.3d 780, 789-90 (6th Cir. 2003); *Blackburn*, 828 F.2d at 1182-83) ("[T]he failure to call a known alibi witness generally . . . constitute[s]

ineffective assistance of counsel."); *see also Wilson v. Cowan*, 578 F.2d 166, 168 (6th Cir. 1978) (reaching same conclusion under pre-*Strickland* standard).

After learning of the existence of Upshaw's alibi defense, Blake had various remedial options available to him to avoid the preclusion of Upshaw's alibi witnesses. The most reasonable course of action was for Blake to argue for an adjournment which, given the circumstances, the trial court was obliged to grant. *See People v. Merritt*, 238 N.W.2d 31, 37-38 (Mich. 1976) (providing that it would be an abuse of discretion for the trial court to preclude a defendant from filing a timely alibi notice by denying a continuance where there is no evidence of prejudice to the prosecution or intentional delay by the defendant). But at the very least, Blake could have requested permission to file a late alibi notice. *See* Mich. Comp. Laws § 768.20(1) (requiring notice to be served "not less than 10 days before the trial of the case, *or at such other time as the court directs*") (emphasis added); *People v. Travis*, 505 N.W.2d 563, 568 (Mich. 1993) (explaining that this language "preserves the trial court's discretion to fix the timeliness of notice in view of the circumstances"). Blake, however, did neither.[8] Instead, he

---

[8] It seems likely that Blake's failure to request permission to file a late alibi notice was at least partially based on his lack of knowledge of the trial court's discretion "to fix the timeliness of notice in view of the circumstances." *Travis*, 505 N.W.2d at 568; (*see* ECF No. 23 at Pg ID 1575 ("Even during trial, I kept telling him [about my alibi witnesses]. He was like, 'We can't do nothing. We – it's a deadline. I didn't meet my deadline.'").) This is further evidence of deficient

26

compounded his ineffectiveness by emphasizing that the adjournment request was coming from his client, not him, and assuring the trial court that he could be ready to try the case the following week.  (ECF No. 6-5 at Pg ID 322 ("*Mr. Upshaw wants an adjournment.  He doesn't feel that we're quite ready.  I told him that I would bring myself up to speed by the time for the trial date.*") (emphasis added); ECF No. 23 at Pg ID 1567.)

Counsel's actions were not objectively reasonable.  *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) (citing *Strickland*, 466 U.S. at 688) ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."); *Matthews*, 319 F.3d at 790 (finding that trial counsel "[met] the standard for incompetence" where he "actively barred his client from introducing [an] alibi witness" and thereby "appear[ed] to . . . furnish[] a net negative to the defense"); *Clinkscale*, 375 F.3d at 443-44 & n.9 (holding that trial counsel's failure to call the defendant's father as an alibi witness was objectively unreasonable even though the jury might have suspected the father had motive to lie and might have found his alibi weak).  Blake offered no reason for his actions and in fact indicated that if he had been retained so soon before Upshaw's trial, he certainly would have

---

performance.  *See King v. Westbrooks*, 847 F.3d 788, 797 (6th Cir. 2017) (quoting *Hinton v. Alabama*, 571 U.S. 263, 274 (2014)) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

requested a continuance. But, again, he did not. Upshaw has accordingly overcome the "strong presumption that [his] counsel's conduct [fell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The Court reaches the same conclusion even if it considers only the record before the State court.

That record reflects, at the very least, trial counsel's failure to investigate Upshaw's alibi defense. *See Stewart*, 468 F.3d at 356 (an attorney's duty "includes the obligation to investigate all witnesses *who may have information* concerning his or her client's guilt or innocence") (emphasis added). Despite being aware of Upshaw's claim that he was home with Woods, Holloway, and Green at the time of the armed robbery, Paige apparently did nothing to investigate that defense. The Court sees no reasonable justification for that failure. *See Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007) ("[T]he investigation leading to the choice of a so-called trial strategy must itself have been reasonably conducted lest the 'strategic' choice erected upon it rest on a rotten foundation.").

Blake could have attempted to remedy that defect when he stepped in as trial counsel but he made no attempt to do so. Although he was hired to represent Upshaw less than two weeks before trial, the record reflects that a week before trial Blake still had not reviewed the evidence against Upshaw. (*See* ECF No. 6-5 at Pg ID 321-22.) Blake was made aware of Upshaw's alibi defense. Yet Blake

28

undermined Upshaw's request for a continuance, which would have given Blake time to investigate and prepare a defense.  Again, there is no reasonable justification for counsel's decisions.

### 2) Prejudice

"When trial counsel fails to present an alibi witness, 'the difference between the case that was and the case that should have been is undeniable.'"  *Caldwell v. Lewis*, 414 F. App'x 809, 818 (6th Cir. 2011) (quoting *Stewart* 468 F.3d at 361) (brackets omitted).  For this reason, the Sixth Circuit has repeatedly found prejudice where trial counsel fails to present a known alibi witness, especially where "alibi is a critical aspect of [the] defendant's defense."  *Clinkscale*, 375 F.3d at 443; *see, e.g.*, *Stewart*, 468 F.3d at 360 (finding prejudice where the "[p]etitioner's entire defense strategy was an alibi defense").

In this case, Upshaw's defense was that he had been misidentified and was elsewhere at the time of the gas station robbery.  (ECF No.  6-14 at Pg ID864.)  But because of Blake's deficient performance, Upshaw did not offer a single alibi witness to back up that argument.  By Blake's own admission, Haugabook could not "testify to where . . . Upshaw was at the time that the shooting happened" and would not be providing Upshaw with an alibi.  (ECF No. 6-9 at Pg ID 670.)  Through Haugabook, Upshaw was able to establish only that he had been dropped off at home around 3:20 a.m. and was wearing different shoes than those worn by

the perpetrator of the armed robbery several minutes later.  (ECF No. 6-8 at Pg ID 542-44; ECF No. 6-10 at Pg ID 682-83.)  This was not much of a defense.

In contrast, had Holloway and Green been able to testify, the jury would have heard an entirely different narrative.  The State court records reflect that, at the very least, Green would have told the jury that within minutes of the robbery taking place, Upshaw was at home, with her, his aunt, his daughter, and his daughter's mother, being reprimanded by Green, and that he left the house the next morning, hours after the armed robbery occurred.  (ECF No. 23 at Pg ID 1608-09, 1613-15; ECF No. 6-14 at Pg ID 884.)

The Court finds no reasonable explanation for presenting Haugabook as a witness but not Upshaw's alibi witnesses, and Blake has offered none.  Haugabook could have bolstered and corroborated Green's and Holloway's alibi testimony. Standing alone, Haugabook's testimony was of marginal benefit to the defense.

Contrary to the State court's conclusion, Green's statements did place Upshaw at home at the time of the robbery—or close enough to it that "there is a reasonable probability that, but for counsel's [failure to investigate and present her testimony], the result of the proceeding would have been different."[9]  *Strickland*,

---

[9] Green's statement strongly suggests that Upshaw was home from 3:20 a.m. until he left at 7:45 a.m.  Effective counsel at least would have questioned Green to determine whether she knew and intended to convey in her statement that Upshaw was home this entire period.

466 U.S. at 694. Green's statements had to be read in context of Haugabook's testimony that he dropped Upshaw at home around 3:20 a.m., trial testimony that Walker entered the gas station at 3:35 a.m. and the person believed to be Upshaw approached seconds before 3:37 a.m., that they both arrived on foot, that the gas station is approximately three-and-a-half miles from Upshaw's home, and Walker's statement that Upshaw was not with him at the gas station when the robbery occurred.

There is no reason to conclude that Green or Holloway would have testified to anything other than what has been presented in the record. And while the Court recently learned that Green is now deceased, her statement is part of the record and may be considered. *See* Rule 7(b) of the Rules Governing § 2254 Cases (permitting a federal habeas court to consider "letters predating the filing of the petition" as well as "documents" and other "exhibits"). The Michigan Court of Appeals noted that Green's statement did not comply with Michigan Court Rule 2.119(B), *see* 2016 WL 2942215, at *6; however, the court did not strike the statement, although it had the authority to do so, and still evaluated it as an offer of proof.

Respondent argues that Upshaw cannot demonstrate prejudice because "the jury would not have been obligated to believe the[] testimony" of his alibi

31

witnesses.  (ECF No. 24 at Pg ID 1636.)  However, the Sixth Circuit rejected a

nearly identical argument in *Clinkscale*:

> The state attacks the significance of Arthur Clinkscale's
> affidavit on the grounds that: (1) he is defendant Clinkscale's father
> and therefore has a motive to lie; and (2) the substance of his affidavit
> "only barely provides an alibi for Clinkscale" because "Clinkscale
> could certainly have driven from Columbus to Youngstown in the
> hours between the shooting and the time his father allegedly saw him
> that morning."  . . .  These arguments are unavailing.  In considering
> the significance of this affidavit, our role is limited to determining
> whether there is a "reasonable probability" that the outcome of
> Clinkscale's trial would have been different but for his counsel's
> errors.  *Strickland*, 466 U.S. at 694.  The factors that the state has
> highlighted may ultimately affect the credibility of Arthur
> Clinkscale's testimony in the eyes of the jury, but they are not
> dispositive with respect to our analysis.

375 F.3d at 444 n.9.  The lesson from *Clinkscale* is that where a defense theory

hinges upon placing the defendant elsewhere than at the scene of the crime, a trial

attorney's failure to call a willing and available alibi witness will likely be

prejudicial even if the persuasive value of the testimony might be diminished on

cross-examination.  *See, e.g.*, *Matthews*, 319 F.3d at 789 (finding a reasonable

probability of a different outcome where trial counsel failed "to present potential

alibi witnesses, whose testimony would have been quite useful, *even if not

conclusive*") (emphasis added).  Indeed, the Sixth Circuit has found prejudice

"even where the state postconviction court said the alibi witnesses would have

been 'unconvincing,' and there were other alibi witnesses presented at trial."

*Caldwell*, 414 F. App'x at 818 (quoting *Bigelow v. Haviland*, 576 F.3d 284, 291

(6th Cir. 2009)); *see also Ramonez v. Berghuis*, 490 F.3d 482, 485-86 (6th Cir. 2007) ("Even though the jury could have discredited the potential witnesses here based on factors such as bias and inconsistencies in their respective stories, there certainly remained a reasonable probability that the jury would not have."); *Matthews*, 319 F.3d at 790 (citing *Strickland*, 466 U.S. at 694) ("[A] 'reasonable probability' does not mean a certainty, or even a preponderant likelihood, of a different outcome, nor, even more, that no rational juror could constitutionally find [the defendant] guilty.") (internal citation omitted).

Finally, "the availability of willing alibi witnesses must . . . be considered in light of . . . otherwise flimsy evidence supporting [a defendant's] conviction." *Avery v. Prelesnik*, 548 F.3d 434, 439 (6th Cir. 2008) (citing *Strickland*, 446 U.S. at 696). Here, contrary to Respondent's assertions, the State's case against Upshaw "was not overwhelming." *Matthews*, 319 F.3d at 790. The State's chief evidence as to Upshaw's guilt was Williams' testimony. But eyewitness testimony is "inherent[ly] unreliab[le]." *Forensic v. Birkett*, 501 F.3d 469, 482 (6th Cir. 2007) (quoting *Watkins v. Sowders*, 449 U.S. 341, 352 (1981)); *see also Wilson v. Cowan*, 578 F.2d 166, 168 (6th Cir. 1978) (explaining that "the identification of strangers in violent crime situations is fraught with the hazard of mistake" and collecting cases). Furthermore, "[e]ven putting aside [the Sixth Circuit's] 'grave reservations concerning the reliability of eyewitness testimony,' the accuracy of

[the] identification [in this case] is highly suspect" given the particular

circumstances under which Williams saw the shooter.  *Clinkscale*, 375 F.3d at 445

(quoting *Blackburn*, 828 F.2d at 1186).  Not only was Williams unable to see the

shooter's entire face, which was covered with a t-shirt, but she viewed him while

in a state of fear, while he pointed a gun and shot at her six or seven times.  (ECF

No. 6-2 at Pg ID 237-38); *see, e.g.*, *Thomas v. Heidle*, 615 F. App'x 271, 278 (6th

Cir. 2015) (listing "factors . . . known to create problems for accurate eyewitness

testimony," including "stress," "fright," and "weapon focus").

Apart from Williams' testimony, the State's only evidence against Upshaw

was that he had been arrested for home invasion with Walker several hours after

the gas station was robbed.[10]  (ECF No. 6-10 at Pg ID 691-94.)  But the Sixth

Circuit has found prejudice in the face of far more damning evidence.  In

*Matthews*, for example, the court found prejudice where trial counsel failed to call

the defendant's family members as alibi witnesses, despite evidence that the

defendant had (1) sold jewelry stolen from the victim's house within days of his

---

[10] Respondent argues that this evidence is "highly incriminating" and must be
considered when deciding *Strickland*'s prejudice prong.  (ECF No. 24 at Pg ID
1649.)  But this argument fails to appreciate that the Court is not determining that
the State court's prejudice analysis was an unreasonable application of *Strickland*.
Rather, the Michigan Court of Appeals' prejudice analysis relies upon multiple
objectively unreasonable *factual* determinations and assumptions.  *See* 28 U.S.C.
§ 2254(d)(2).  Because subsections (d)(1) and (2) of § 2254 are disjunctive, the
Court is not required to *also* find that the State court's prejudice analysis was an
objectively unreasonable *application* of *Strickland*.

murder, and (2) previously been photographed wearing a distinctive jacket that was also seen on a man fleeing the scene of the crime.  319 F.3d at 783-84, 789-90. Likewise, in *Stewart*, the court found prejudice where two alibi witnesses were unable to testify due to a deficient alibi notice, even though one of the State's witnesses "testified that he saw [the defendant] holding a gun and point[ing] the gun . . . at the victim" and another testified that the defendant had "stated he was going to kill the victim."  468 F.3d at 343-44, 357-59.

"If [Upshaw's] alibi witnesses are to be believed, they present a complete defense to the crime."  *United States v. Murillo*, No. 07-20417, 2011 WL 5039800, at *13 (E.D. Mich. Oct. 24, 2011).  "Had even one alibi witness been permitted to testify," Haugabook's testimony would have been corroborated and far more persuasive.  *Clinkscale*, 375 F.3d at 445.  And the jury would not have been left to wonder why no one could account for Upshaw's whereabouts at the time of the crime.  Without Upshaw's alibis, however, "the only credible identifying witness's testimony [was] virtually unchallenged" and the jury was "foreclosed . . . from hearing valuable countervailing evidence."  *Blackburn*, 828 F.2d at 1186.  Thus, because there is a substantial likelihood that the trial would have turned out differently if counsel had called even one alibi witness, habeas relief is appropriate based on Claim I.

35

**B.      Prosecutor's Dismissal of Six Black Prospective Jurors (Claim III)**

In his third claim, Upshaw argues that he was denied equal protection, in

violation of the Fourteenth Amendment, when the prosecutor used six of her

peremptory challenges against Black prospective jurors in violation of *Batson*.

(ECF No. 1 at Pg ID 8.)  In *Batson*, the Supreme Court held that the Equal

Protection Clause prohibits a prosecutor from using the State's peremptory

challenges for the purpose of excluding from the jury members of the defendant's

race.  476 U.S. at 96.

*1)      State Court's Decision*

The Michigan Court of Appeals rejected Upshaw's *Batson* claim, [11]

summarizing the trial proceedings and reasoning:

> Our Supreme Court in *Knight* stated that *Batson* "announced a three-
> step process for determining the constitutional propriety of a
> peremptory challenge."  [*People v. Knight*, 473 Mich. 324, 336
> (2005)].  "First, the opponent of the peremptory challenge must make
> a prima facie showing of discrimination." *Id.*  . . .  "Second, if the
> trial court determines that a prima facie showing has been made, the
> burden shifts to the proponent of the peremptory challenge to
> articulate a race-neutral explanation for the strike." *Id.* at 337. . . .
> "Finally, if the proponent provides a race-neutral explanation as a
> matter of law, the trial court must then determine whether the race-

---

[11] While Upshaw last presented his *Batson* claim in his July 10, 2018 motion for
relief from judgment (ECF No. 6-12 at Pg ID 763-65), the State trial court made no
reference to the claim when denying the motion (ECF No. 6-13 at Pg ID 855-59.)
The Court therefore "look[s] through the [trial court's] unexplained decision to the
last related state-court decision that does provide a relevant rationale[.]" *Wilson v.
Sellers*, 138 S. Ct. 1188, 1192 (2018).

neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination." *Id.* at 337-338. . . .

In the instant case, after the prosecutor exercised multiple peremptory challenges, Upshaw's attorney informed the trial court that he had a motion to make. The trial court excused the veniremembers and those remaining in the jury pool. Upshaw's counsel then presented a *Batson* challenge, arguing that six of the eight peremptory challenges exercised by the prosecutor pertained to African-Americans; both defendants are African-American. Walker's attorney indicated that he would join in the motion. Other than noting the number of peremptory challenges exercised by the prosecutor and the race of those excused veniremembers, the defense attorneys did not provide any additional argument in support of making a prima facie case of discrimination. The trial court, failing to indicate whether defendants had made the required prima facie showing of discrimination, asked the prosecutor whether she had any response as to why the African-American veniremembers were excused. The prosecutor then provided race-neutral explanations for the strikes in regard to four of the African-American veniremembers. Before the prosecutor could continue with her explanations concerning the remaining two African-American veniremembers, the trial court interjected, asking Upshaw's counsel whether he had any response. Upshaw's attorney then began addressing and challenging the race-neutral explanation given by the prosecutor in regard to one of the stricken veniremembers. The trial court quickly chimed in, "Yes, but are you saying that's a pretext to get her off the jury because she's black?" Upshaw's counsel replied in the affirmative, at which point the trial court queried, "Anything else?" Upshaw's attorney replied, "No, your Honor." Walker's attorney also indicated that he had nothing to add.

Next, the trial court ruled:

Well, the prosecutor has given some explanation other than race being challenged. I don't think the *Batson* motion can be sustained. I don't have any further comments on whether it's good or bad. . . . .

After some further discussion on the matter, Upshaw's attorney began challenging the race-neutral explanation given by the prosecutor regarding another veniremember, but the trial court interrupted, making clear that it had denied the *Batson* motion.

In *Knight*, 473 Mich. at 339, our Supreme Court counseled the bench with respect to *Batson* challenges, stating that "trial courts must meticulously follow Batson's three-step test, and we strongly urge our courts to clearly articulate their findings and conclusions on the record." The Court further noted that "when a trial court methodically adheres to *Batson*'s three-step test and clearly articulates its findings on the record, issues concerning what the trial court has ruled are significantly ameliorated." *Id.* at 338-339. Here, unfortunately, the trial court failed to adhere to the directive announced by the *Knight* Court a decade earlier.

With respect to the first step, i.e., whether defendants made a prima facie showing of discrimination, actual proof of discrimination is not required. *Id.* at 336. And, given that there is no dispute that the veniremembers at issue in this case were members of a cognizable racial group and that peremptory challenges were exercised to exclude them from the jury, the question in regard to step one becomes whether all of the relevant circumstances raised an inference that the prosecutor struck the excluded veniremembers on the basis of race. *Id.* The trial court's statements on the bench failed to expressly indicate whether it found that defendants had made a prima facie case of discrimination. Although such a finding might be implied because the court asked the prosecutor to articulate explanations for why veniremembers were stricken, the court's ruling is ultimately unclear and muddled on the matter. We cannot conclude, on the existing record, that defendants made a prima facie showing or case of racial discrimination. While not binding precedent, we find persuasive the following discussion by the United States Court of Appeals for the Eleventh Circuit in *United States v Ochoa-Vasquez*, 428 F3d 1015, 1044 ([11th Cir.] 2005):

> In order to determine whether a *Batson* objector . . . has established a prima facie case of discrimination, courts must consider all relevant circumstances. This Court has cautioned that the mere fact of striking a juror or a set of

jurors of a particular race does not necessarily create an inference of racial discrimination. While statistical evidence may support an inference of discrimination, it can do so only when placed in context. For example, the number of persons struck takes on meaning *only* when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck. . . . .

The Eleventh Circuit observed that pertinent circumstances to consider include the racial composition of remaining potential jurors, "the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire," whether members of the relevant racial group served unchallenged on the jury, and whether the prosecutor used all or nearly all of his or her challenges to strike veniremembers of a particular race. *Id.* at 1044-1045. Here, the only argument posed by defense counsel during voir dire was that six of eight peremptory challenges exercised by the prosecutor concerned veniremembers of the same race as defendants. Neither Walker nor Upshaw's attorney made a record regarding any other surrounding circumstance, such as those alluded to in *Ochoa-Vasquez*, nor are we able to discern from the existing record whether additional relevant facts or circumstances were present, e.g., information regarding the percentage of African-American jurors on the venire. Assuming that the trial court found that defendants had made a prima facie case of discrimination, it erred in that part of its analysis. Absent a prima facie showing of discrimination, the remaining two steps in the *Batson* analysis are rendered moot. Reversal is unwarranted.

2016 WL 2942215, *7-8 (original brackets and footnote omitted).

> 2) *Overall Analysis*

Although the Michigan Court of Appeals correctly identified *Batson* as

providing the relevant standard, its application of *Batson* and its progeny was

objectively unreasonable. 28 U.S.C. § 2254(d)(1). Specifically, the State court

failed to adhere to the Supreme Court's admonition that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion).[12]

In *Lancaster v. Adams*, the Sixth Circuit, applying *Batson* and *Hernandez*, held that the State court unreasonably applied Supreme Court precedent by solely analyzing step one of the *Batson* analysis—the strength of the petitioner's prima facie showing of discrimination—even though "the trial court . . . had ruled on the ultimate question under *Batson*." 324 F.3d 423, 435 (6th Cir. 2003).  Here, like in

---

[12] Respondent argues that *Hernandez* is not "clearly established" for purposes of AEDPA because it was a plurality opinion.  (ECF No. 5 at Pg ID 183.)  The Sixth Circuit has explicitly rejected this argument, however.  *See Drain v. Woods*, 595 F. App'x 558, 570 (6th Cir. 2014) (citation omitted) ("This Court has previously applied *Hernandez*'s mootness holding as clearly established law and we see no reason to treat it otherwise now."); *see also Braxton v, Gansheimer*, 561 F.3d 453, 461 (6th Cir. 2009) (treating *Hernandez*'s mootness holding as clearly established); *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004) ("We are . . . bound by any prior Sixth Circuit decisions concluding that federal law on a particular issue has been 'clearly established' by certain holdings of the Supreme Court.").  Moreover, the concurring justices in *Hernandez* "wr[o]te separately because [they] believe[d] that the plurality opinion [went] further than it need[ed] to in assessing the constitutionality of the prosecutor's asserted justification for his peremptory strikes."  *Hernandez*, 500 U.S. at 372 (O'Connor, J., concurring in the judgment). However, they otherwise "agree[d] with [the plurality's] analysis of th[e discriminatory intent] issue," a necessary subset of which was its preliminary mootness determination.  *Id.*

*Lancaster*, the trial court reached step two and three of the *Batson* inquiry,[13] but the court of appeals nevertheless analyzed the prima facie issue anew and rested its decision solely on that issue.  (ECF No. 6-7 at Pg ID 427; ECF No. 6-14 at Pg ID 870.)  This was an unreasonable application of *Batson* and *Hernandez.  See Lancaster*, 324 F.3d at 435; *cf. Braxton v. Gansheimer*, 561 F.3d 453, 461 (6th Cir. 2009) (citing *Lancaster*, 324 F.3d at 435) (concluding "that the Ohio Court of Appeals' application of *Batson* and *Hernandez* was neither erroneous nor unreasonable *because the appellate court did not rely solely upon the moot issue* in rejecting [the petitioner's] *Batson* claim") (emphasis added).

Accordingly, the Court will review de novo the trial court's *Batson* inquiry, "unencumbered by the deference AEDPA normally requires."  *Rice*, 660 F.3d at 251-52 (quoting *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007)); *see also id.* (citing *Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522, 525 (6th Cir. 2010)) (explaining that a claim adjudicated on the merits is review de novo "if the petitioner shows, by virtue of one of its exceptions, that the relitigation bar of § 2254(d) does not apply" and explaining that one of

---

[13] As set forth in more detail below, the trial court failed to conduct the proper analysis at step three. However, this failure does not change the fact that the court still reached a final decision on the merits of Upshaw's motion, mooting the prima facie inquiry on appeal.

those exceptions includes the state court's unreasonable application of clearly established law).

> 3) *Batson* Steps Two and Three

As set forth above, "[Upshaw] met his burden [at step one] because the prosecutor proceeded to step two of *Batson* before the trial court made a ruling at step one. As a result, 'the preliminary issue of whether [Upshaw] . . . made a prima facie showing [is] moot.'" *Rice*, 660 F.3d at 258 (quoting *Braxton*, 561 F.3d at 461); *see Hernandez*, 500 U.S. at 355 (plurality opinion). Accordingly, the Court proceeds directly to steps two and three.

At step two, "the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question." *Hernandez*, 500 U.S. at 358 (citing *Batson*, 476 U.S. at 97-98); *see Johnson v. California*, 545 U.S. 162, 171 (2005) (noting that "even . . . frivolous or utterly nonsensical justification[s]" are sufficient to satisfy this step of the inquiry). Finally, step three requires the trial court to "determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez*, 500 U.S. at 358 (citing *Batson*, 476 U.S. at 98); *see Bryan v. Bobby*, 843 F.3d 1099, 1110 (6th Cir. 2016) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)) (explaining that "[t]he critical question here is . . . whether the trial court finds the prosecutor's race-neutral explanations credible or pretextual").

Upshaw's counsel made his *Batson* motion after the prosecutor exercised peremptory challenges against eight prospective jurors, six of whom were Black. (ECF No. 6-14 at Pg ID 869.)  And although Upshaw's counsel initially referenced only two of the stricken Black jurors by name, it is clear that his challenge encompassed all six.  (ECF No. 6-7 at Pg ID 426 (arguing that "[a]ll of them had neutral responses that they could be fair and impartial")); *see People v. Knight*, 701 N.W.2d 715, 728 (2005) (explaining that *Batson* objections launched after several jurors are stricken apply "to all strikes in [an] alleged pattern").

After moving past the prima facie determination, the trial court engaged the attorneys in the following colloquy:

THE COURT: Do you have any response why they were challenged?

[PROSECUTOR]: Well, do you want me to go specifically one by one, Judge?

THE COURT: Go ahead.

[PROSECUTOR]: Ms. Stinson, I dismissed recently because she seemed to have very delayed responses to questions as if she really wasn't focused or paying attention and she's an older female.  As relates to Ms. Williams, Ms. Williams is convicted of a CCW.  Mr. Smith was in seat #6, I believe.

THE COURT: He was.  He's the jury with had [sic] the relatives in prison.

[PROSECUTOR]: Yes, thank you, Judge.  That is correct.  Ms. Jones, was a student, I believe.  I believe she was too young, in my opinion.  Too young for this particular case.  Not based on her race, but based on her age.  I also thought that when I watched her, her demeanor was

43

very distracted. You'd have to repeat questions to her as if she really wasn't listening. That is seat #13. I think that I've established—

THE COURT: Mr. Blake?

MR. BLAKE: Well, Judge, too young? Apparently she's not too young, Ms. Jones, to be a juror. So, that particular response is—

THE COURT: Yes, but are you saying that's a pretext to get her off the jury because she's black?

MR. BLAKE: Yes, Judge.

THE COURT: Anything else?

MR. BLAKE: No, your Honor.

THE COURT: Mr. Goze?

[WALKER'S COUNSEL]: Just joining what the Counsel said.

THE COURT: Well, the Prosecutor has given some explanation other than race being challenged. I don't think the Batson motion can be sustained. I don't have any further comments on whether it's good or bad. That's the strategy of a trial. The Batson challenge, well, see Batson would be to a specific juror. Were you challenging her excusal of the last, of White and Stinson?

MR. BLAKE: Of both of the Jones'; Pamela Jones.

THE COURT: No, you can't do it that way. Once you say there's a pattern, then you challenge a specific juror challenge.

MR. BLAKE: Well, Judge, with respect to Ms. Stinson, the fact that she's elderly. She gave direct responses, although they weren't rapid speed, but her answers were clear and concise and we'd ask the Court not to excuse her.

> THE COURT: Denied.  As to Ms. White?  She was challenged in the last challenges by the People.  Was she the student?  Ms. White has not been challenged?
>
> [PROSECUTOR]: Ms. White was in seat #14.  She was a white female.
>
> THE COURT: Oh, then it doesn't apply.

(ECF No. 6-7 at Pg ID 426-28.)

"In criminal trials, trial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019).  In this instance, the trial court failed to shoulder this burden.

Although the trial court directed the prosecutor to explain her strikes "specifically one by one," the prosecutor offered race-neutral explanations for her strikes against only three jurors: Margie Stinson, Perrice Williams, and Kimberly Jones.  (ECF No. 6-7 at Pg ID 426-27.)  The trial court provided the race-neutral explanation for the prosecutor's excusal of a fourth juror, Donald Smith.  (*Id.* at Pg ID 427.)  And no race-neutral explanations were ever proffered for the prosecutor's strikes of Latrice Wilborn and Pamela Jones.  (*Id.* at Pg ID 426-28.)  Finally, rather than properly evaluating the prosecutor's explanations for any indications of pretext, as required by *Batson*, the trial court found that there had been no discrimination merely because "the Prosecutor ha[d] given some explanation other

45

than race being challenged." (*Id.* at Pg ID 427.) These errors warrant habeas relief.

Batson itself makes clear that a trial court cannot "flatly reject[] [an] objection [to a peremptory strike] without *requiring* the prosecutor to give an explanation for [her] action." 476 U.S. at 100 (emphasis added). However, that is precisely what the trial court did with respect to Wilborn and Pamela Jones. (ECF No. 6-7 at Pg ID 427-28.)

In addition, with respect to Smith, the trial court irreparably tainted the *Batson* inquiry by supplying the prosecutor with a race-neutral reason the court would find acceptable: that Smith had relatives in prison. (ECF No. 6-7 at Pg ID 427); *see Flowers*, 139 S. Ct. at 2243-44 ("*[T]he prosecutor* must provide race-neutral reasons for the strikes). The trial court must consider *the prosecutor's* race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties.") (emphasis added). Although the prosecutor implicitly adopted the trial court's explanation by offering him thanks, the damage was done. (ECF No. 6-7 at Pg ID 427.) "[W]hen a trial court offers its own speculation as to the prosecutor's reasons for striking minority jurors, it essentially disregards its own core function under *Batson*—to evaluate the reasons offered by the prosecutor, including the prosecutor's demeanor and other contextual information, in order to determine the prosecutor's true intent."

*Johnson v. Martin*, 3 F.4th 1210, 1227 (10th Cir. 2021) (citing *Flowers*, 139 S. Ct. at 2243-44); *see Paulino v. Castro*, 371 F.3d 1083, 1089-90 (9th Cir. 2004) ("[I]t does not matter that the prosecutor might have had good reasons to strike the prospective jurors.  What matters is the *real* reason they were stricken.").  In suggesting a race-neutral reason before the prosecutor could supply one herself, the trial court impermissibly signaled to the prosecutor that this was a reason the court was prepared to find credible and never explored the prosecutor's *real* reason.

Finally, with respect to Stinson, Williams, and Kimberly Jones, those jurors for whom the prosecutor actually articulated a race-neutral explanation, the trial court decided the ultimate question of discrimination without conducting the analysis "constitutionally required" at step three.  *Rice*, 660 F.3d at 258.  "The third step is important; *Batson* imposes upon the trial court a strict constitutional 'duty to determine if the defendant has established purposeful discrimination.'"  *Id.* at 250 (quoting *Batson*, 476 U.S. at 98).  "[T]he critical question" at step three is "the persuasiveness of the prosecutor's justification for [her] peremptory strike."  *Cockrell*, 537 U.S. at 338-39.  Here, although the trial court briefly alluded to pretext, it is clear from the record that the court did not actually focus on that issue.  Instead, the court summarily concluded that there had been no discrimination purely because "the Prosecutor . . . [gave] *some* explanation other than race being challenged."  (ECF No. 6-7 at Pg ID 427 (emphasis added).)

47

A trial court's determination at step three is a "historical fact" that may be overturned only if "clearly erroneous." *Hernandez*, 500 U.S. at 367-69; *see Rice*, 660 F.3d at 242 (citing *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)); *Lancaster*, 324 F.3d at 429 (internal quotation marks and citations omitted) ("Under AEDPA, primary or historical facts found by state courts are presumed correct and are rebuttable only by clear and convincing evidence."). Here, the trial court's step three determination was clearly erroneous for three reasons. First, the court did not "require[e] the prosecutor to give an explanation for [two of her peremptory] action[s.]" *Batson*, 476 U.S. at 100. Second, the trial court suggested a race-neutral reason for one of the strikes that the prosecutor could adopt. *See Flowers*, 139 S. Ct. at 2243-44; *Johnson*, 3 F.4th at 1227. Third, the court considered only whether "the Prosecutor ha[d] given some explanation other than race being challenged" (ECF No. 6-7 at Pg ID 427), as opposed to "the persuasiveness of [her] justification for [the] peremptory strike[s,]" *Cockrell*, 537 U.S. at 338-39.[14]

---

[14] Even if the trial court conducted a proper step three inquiry as to Stinson, Williams, and Kimberly Jones, Upshaw would be entitled to habeas relief based on the other errors addressed above—namely, the prosecutor's failure to advance a race-neutral explanation for her strikes against Wilborn and Pamela Jones and the trial court's impermissible suggestion of a race-neutral reason for Smith's excusal. For this reason, the Court does not attempt to review the prosecutor's explanations for Stinson, Williams, and Kimberly Jones using only the cold record.

Respondent argues that "Upshaw's counsel only challenged two of [the prosecutor's] explanations as pretextual" and that "because he failed to argue that the remaining challenged jurors were dismissed for discriminatory reasons, he has failed to meet his burden to succeed on his *Batson* claim." (ECF No. 5 at Pg ID 186.) Although Respondent is correct that Upshaw carries the final "burden of proving purposeful discrimination," *Johnson*, 545 U.S. at 171, Respondent's argument ultimately lacks merit. True, the Sixth Circuit has "held that once the proponent of the peremptory strike proffers a race-neutral explanation, the opposing party has the burden to rebut those reasons on the record," and that "[f]ailure to rebut race-neutral explanations or the district court's conclusion will result in a plain error review." *United States v. McAllister*, 693 F.3d 572, 582 (6th Cir. 2012) (citing *United States v. Jackson*, 347 F.3d 598, 605 (6th Cir. 2003)). But even assuming that this plain error rule is valid,[15] Respondent's logic *at most*

---

[15] The Court questions whether this interpretation of the plain error doctrine is consistent with precedent. *See United States v. Davis*, 809 F.2d 1194, 1202 (6th Cir. 1987) ("*Batson* does not require rebuttal of the Government's explanation by defense counsel. . . . Once the defendants had established a prima facie case of racial motivation sufficient for the district court to make an inquiry of the Government, there was nothing more defendants were required to do."); *see also Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (explaining that "prior decision[s] [of the Sixth Circuit] remain[] controlling authority" unless abrogated by the Supreme Court or the Sixth Circuit sitting en banc). The "failure to rebut" rule appears to stem from a footnote in *United States v. Wilson*, 11 F. App'x 474, 476 n.3 (6th Cir. 2001), which cited neither *Batson* nor its progeny and instead focused on the doctrine of plain error more generally. But

applies to the prosecutor's explanations for Stinson, Williams, Kimberly Jones, and Smith.

Respondent ignores that the prosecutor never offered race-neutral explanations for striking Wilborn and Pamela Jones, and that accordingly, there was "no race-neutral evidence [for the trial court] to weigh," *Paulino v. Harrison*, 542 F.3d 692, 703 (9th Cir. 2008), and nothing for Blake to rebut, *see Johnson*, 545 U.S. at 171 n.6 (citation omitted) ("[Where] the prosecutor declines to respond to a trial judge's inquiry regarding [her] justification for making a strike, the evidence before the judge . . . consist[s] not only of the original facts from which the prima facie case was established, but also the prosecutor's refusal to justify [her] strike in light of the court's request.  Such a refusal . . . provide[s] additional support for the inference of discrimination raised by a defendant's prima facie case.").  Furthermore, despite the prosecutor's failure to come forward with race-neutral explanations, Upshaw's counsel reiterated that he was challenging the

---

this was contrary to the Sixth Circuit's earlier holding in *Davis*, and the Supreme Court's *Batson* cases suggest no such rule.  *See, e.g.*, *Cockrell*, 537 U.S. at 326 ("[I]f [a prima facie] showing is made, the prosecutor must then offer a race-neutral basis for striking the juror in question.  Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.").  In any case, because the trial court's summary denial of Upshaw's motion in the absence of two race-neutral explanations from the prosecutor could not withstand even plain error review, the Court need not resolve this conflict.

strike of Pamela Jones, essentially renewing his *Batson* objection.  (ECF No. 6-7 at

Pg ID 428.)  The prosecutor offered no response.  (*Id.*).  Consequently, even if

Respondent's plain error argument had merit with respect to the other jurors

stricken by the prosecutor, the record still supports an inference of purposeful

discrimination as to Pamela Jones.  Respondent has made no arguments to the

contrary.

### 4)  Remedy

Because "even a single instance of race discrimination against a

prospective juror is impermissible," *Flowers*, 139 S. Ct. at 2242, the only

remaining question is the proper remedy.  "District courts have 'broad discretion in

conditioning a judgment granting habeas relief.'"  *Morrell v. Wardens*, 12 F.4th

626, 631 (6th Cir. 2021) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987));

*see also* 28 U.S.C. § 2243 (directing habeas courts to "dispose of the matter as law

and justice require").

The Sixth Circuit has not addressed this precise situation.[16]  The Second,

Seventh, and Tenth Circuits have indicated that a district court presented with these

---

[16] The Sixth Circuit addressed a similar situation in *Ewing v. Horton*, 914 F.3d 1027 (6th Cir. 2019), which involved a claim of extraneous influence on the jury requiring an evidentiary hearing "to afford the defendant the opportunity to establish actual bias" pursuant to *Remmer v. United States*, 347 U.S. 227, 229-30 (1954).  The *Ewing* court acknowledged "that the passing of time since [the defendant]'s conviction eight years ago may make it difficult to conduct a suitable

circumstances must remand for a new trial if the passage of time since jury

selection renders it "impossible or unsatisfactory" for the state court to conduct a

hearing attempting "to reconstruct the prosecutor's state of mind at the time of jury

selection." *Jordan v. Lefevre*, 206 F.3d 196, 202 (2d Cir. 2000); *accord Johnson v.*

*Martin*, 3 F.4th at 1227 ("If the district court concludes that a *Batson*

reconstruction hearing is impossible or unsatisfactory, it must grant habeas relief in

the form of an order that [the petitioner] be released from custody unless the State

grants him a new trial within 120 days from the entry of the district court's

order."); *United States v. McMath*, 559 F.3d 657, 666 (7th Cir. 2009) (same).  This

is the approach the Supreme Court took in *Snyder v. Louisiana*, albeit not in a

habeas posture.  *See* 552 U.S. at 486 (declining to remand for judicial factfinding

because roughly eleven years had passed since the petitioner's trial).

Here, like *Snyder*, there is no "realistic possibility that [*Batson*'s] subtle

question of causation could be profitably explored further" due to the eight-year

---

*Remmer* hearing at this stage," but concluded that it would not be impossible.  914
F.3d at 1033-34.  Its decision, however, was largely based upon the fact that the
defendant had not shown actual prejudice, and that a hearing to determine
prejudice was the Supreme Court's well-established remedy for "allegations of
juror partiality."  *Id.* at 1031.  Here, in contrast, Upshaw's "*Batson* error is
structural, requiring automatic reversal without a showing of prejudice."  *United*
*States v. Whiteside*, 747 F. App'x 387, 396 n.6 (6th Cir. 2018) (citing *McAllister*,
693 F.3d at 582 n.5).  And the Supreme Court has recognized that improper *Batson*
factfinding cannot realistically be explored if too much time has passed between
jury selection and remand.  *See Snyder*, 552 U.S. at 486.  Accordingly, *Ewing* is
not controlling.

lapse since Upshaw's trial.  *Id.*  The trial court judge is no longer on the bench but, even if he were, conditioning the writ upon a reconstruction hearing at this late juncture would place an unreasonable burden on both the prosecutor and the judge with unreliable results.  *See Jones v. Butler*, 864 F.2d 348, 370 (5th Cir. 1988) ("Years after trial, the prosecutor cannot adequately reconstruct his reasons for striking a venireman.  Nor can the judge recall whether he believed a potential juror's statement that any alleged biases would not prevent him from being a fair and impartial juror."); *see also United States v. Biaggi*, 909 F.2d 662, 679 (2d Cir. 1990) ("Postponing consideration of a *Batson* claim until the trial is . . . completed, as in this case, risks infecting what would have been the prosecutor's spontaneous explanations with contrived rationalizations, and may create a subtle pressure for even the most conscientious [trial] judge to accept explanations of borderline plausibility to avoid . . . a new trial."); *see generally* William H. Burgess & Douglas G. Smith, *The Proper Remedy for a Lack of Batson Findings: The Fall-Out from Snyder v. Louisiana*, 101 J. Crim. L. & Criminology 1, 24 (2011) ("In addition to the unreasonableness of asking trial courts to make retroactive findings on *Batson* challenges, such requests invite post hoc justifications on remand from prosecutors for making peremptory challenges and from trial judges in allowing them.").

For these reasons, the Court concludes that Upshaw is entitled to relief based on Claim III, as well, and a new trial is the only way to cure the violation of Upshaw's Fourteenth Amendment rights.

### C.    Trial Court's Denial of an Adjournment (Claim II)

In his second claim, Upshaw argues that he was denied due process when the trial court denied his request for an adjournment to give Blake the opportunity to prepare for trial.  (ECF No. 1 at Pg ID 7.)

The Supreme Court has cautioned that "broad discretion must be granted [to] trial courts on matters of continuances." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). Nevertheless, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) (citing *Chandler v. Fretag*, 348 U.S. 3 (1954)).  To warrant habeas relief under due process principles, the "petitioner must show that [the trial court's] error was so egregious as to deprive him of a fundamentally fair adjudication" and that "the denial of his request resulted in actual prejudice to his defense."  *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003) (citation omitted).  "Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise benefited the defense."  *Id.* (citation omitted).

As set forth above, Upshaw requested an adjournment a week before trial. (ECF No. 6-5 at Pg ID 321-22.)  Upshaw explained to the trial court that he recently had to replace Paige and wanted Blake, who had neither reviewed the video of the incident nor acquired the preliminary examination transcript, to have more time to prepare for trial.  (*Id.* at Pg ID 322.) [17]  Upshaw did not delve into the alibi issue because he was worried about letting the prosecutor in on his defense strategy and "[didn't] really know how . . . this stuff works."  (ECF No. 23 at Pg ID 1578.)  The trial court denied Upshaw's request without explanation, stating, "I'm not granting an adjournment at this point.  We'll see what happens."  (ECF No. 6-5 at Pg ID 322.)

Although the Court strongly disapproves of this "[w]e'll see what happens" approach, the trial judge's decision ultimately did not amount to a denial of due process.  That is because Blake, who had authority to make strategic decisions for Upshaw, *see Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988), represented that a continuance was unnecessary (ECF No. 6-5 at Pg ID 322).  This significantly undercut Upshaw's claim that Blake needed extra time to prepare for trial, especially in the absence of any information about Upshaw's alibi witnesses.  (*Id.*).  Accordingly, while Blake's statement that additional time would not be necessary

---

[17] The trial transcript reflects that Blake ultimately did familiarize himself with those items prior to trial, even if he had not yet reviewed them at the time of the pre-trial conference. (ECF No. 6-8 at Pg ID 534, 567.)

underscores his ineffectiveness, it also shows that the trial court's denial of Upshaw's request was not an "error . . . so egregious as to deprive [Upshaw] of a fundamentally fair adjudication." *Powell*, 332 F.3d at 396. Habeas relief is thus unwarranted on Claim II.

## V.     Conclusion

In summary, the Court concludes that Upshaw is entitled to the writ of habeas corpus based on Claims I, III, and VI.

Accordingly,

**IT IS ORDERED** that Upshaw's application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **GRANTED** and his Michigan convictions for felony-firearm, armed robbery, and carrying a dangerous weapon are **VACATED**.

**IT IS FURTHER ORDERED** that the State of Michigan must grant Upshaw a new trial within 120 days of the date of this Opinion and Order or discharge him from any further punishment related to these convictions.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: July 14, 2022