# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: March 28, 2024

Mr. Daniel Scott Harawa
New York University
School of Law
245 Sullivan Street
Fifth Floor
New York, NY 10012

Mr. Zach Hollstrom
Washington University School of Law
Law Student
St. Louis, MO 63130

Ms. Faith Katz
Washington University School of Law
Law Student
St. Louis, MO 63130

Mr. John S. Pallas
Office of the Attorney General
of Michigan
P.O. Box 30217
Lansing, MI 48909

Mr. Jared D. Schultz
Office of the Attorney General
of Michigan
P.O. Box 30217
Lansing, MI 48909

Mr. Jacob Seeley
Washington University School of Law
Law Student
St. Louis, MO 63130

Mr. Malak Shahin
Washington University School of Law
Law Student
St. Louis, MO 63130

            Re:  Case No. 22-1705, *Lafayette Upshaw v. George Stephenson*
                  Originating Case No. : 2:20-cv-12560

Dear Counsel,

    The court today announced its decision in the above-styled case.

    Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                        Yours very truly,

                        Kelly L. Stephens, Clerk

                        Cathryn Lovely
                        Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0067p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

LaFayette DeShawn Upshaw,

                *Petitioner-Appellee*,

     *v.*

George Stephenson, Warden,

                *Respondent-Appellant*.

No. 22-1705

———————————

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-12560—Linda V. Parker, District Judge.

Argued: October 25, 2023

Decided and Filed: March 28, 2024

Before: MOORE, GIBBONS, and STRANCH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Jared D. Schultz, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Daniel S. Harawa, NEW YORK UNIVERSITY, New York, New York, for Appellee. **ON BRIEF:** Jared D. Schultz, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Daniel S. Harawa, Zach Hollstrom, Faith Katz, Jacob Seeley, Malak Shahin, WASHINGTON UNIVERSITY, St. Louis, Missouri, for Appellee.

———————————

## OPINION

———————————

JANE B. STRANCH, Circuit Judge. This appeal centers on the habeas petition of Lafayette Deshawn Upshaw, a state inmate in the custody of the Michigan Department of

Corrections.  In 2014, the State charged Upshaw with crimes associated with two separate incidents that occurred on the same day: a gas station robbery and a home invasion.  Upshaw entered a plea deal in the home invasion case but went to trial and was convicted on counts stemming from the robbery.  Michigan's state courts affirmed his robbery conviction on direct appeal.  After exhausting his state court remedies, Upshaw filed a petition for habeas relief in federal court.  The district court granted relief on two of Upshaw's claims: an ineffective assistance of counsel claim based on trial counsel's failure to investigate alibi witnesses and a *Batson* claim deriving from the State's use of peremptory challenges to strike six Black jurors. The Warden now appeals.  **We AFFIRM.**

## I.  BACKGROUND

### A.  Factual Background

After concluding work around 3:00 a.m. on May 28, 2014, Upshaw got a ride home from his boss, during which the pair discussed the tan Timberland boots that Upshaw was wearing. He arrived home around 3:15 or 3:20 a.m., where, according to evidence from Upshaw, his aunt, Crystal Holloway, and his grandmother, JoAnn Green, Upshaw knocked on the door to his home, which woke up his grandmother.  Holloway, who suffers from insomnia, was awake when Upshaw knocked, and let him into the house.  Green proceeded to "cuss[] [Upshaw] out" for waking her up, after which Upshaw went upstairs and played with his daughter until approximately 4:00 a.m.

Just after 3:35 a.m. that morning, a man robbed a gas station a little over three and a half miles away.  Standing by the cash register in a bullet-proof glass "cage," Tina Williams, the only gas station employee working that night, heard a man say to a female customer, "give me your money."  Williams heard this, looked up, and saw a man who was wearing a gray hoodie, blue shoes,[1] and a t-shirt pulled over his nose and mouth.  The gunman then pointed his weapon at her, demanding she turn over money; when Williams instead locked the cage door, the man fired a shot at her.  The man attacked the store display under the cage, continuing to shoot at least half

---

[1]The parties and witnesses alternatively describe the shoes of the person who committed the robbery as "purple" and "blue."  This distinction is immaterial.  What matters is that the robber wore blue or purple sneakers.

a dozen times until he ran out of bullets, and then fled. Another man at the scene, later identified as Darrell Walker, remained at the coffee machine during the shooting, did not run when the shooter pointed the gun in his direction, and yelled at the cashier to open the door to the cash to stop the shooting.[2] A few hours later, police apprehended Walker and Upshaw invading a police officer's home. Five days later, on June 3, Williams identified Upshaw in a police photo array as the robber. The State indicted Upshaw for the store robbery.

### B. Trial Proceedings

Upshaw and Wright were arraigned for the gas station robbery on July 25, 2014. During their initial appearance before the trial judge on August 5, the attorney retained by Upshaw's family, Anthony Paige, failed to appear. Upshaw later informed Paige of three potential alibi witnesses: Holloway; Green; and his girlfriend, Diamond Woods. Paige never provided Upshaw with any indication that he investigated any of these witnesses. On November 30, Upshaw's mother, Toya Green, submitted a notarized letter to Michigan's Attorney Grievance Commission, explaining that Paige failed to appear at "four required court hearings on four different days" and did not "notify the court or [Green] of his inability to keep the scheduled court hearings." Roughly two weeks before trial, Upshaw fired Paige over Paige's failure to investigate, appear in court, and keep Upshaw informed of developments in his case.

Upshaw then retained Wright Blake to represent him. During their first meeting, Upshaw informed Blake of his three known alibi witnesses—Holloway, Green, and Woods. (Blake did not follow up, then or later, with Upshaw's alibi witnesses, spent his first meeting with Upshaw reviewing his case file, and did not support Upshaw's request to the trial judge for an adjournment, instead assuring Upshaw and the judge that he would "bring [himself] up to speed by" the trial date.)

---

[2]Williams identified Upshaw's co-defendant, Walker, as the man who walked down the coffee aisle shortly before the robbery commenced. Williams also testified that Walker told her to call the police and left the store shortly after the man who committed the robbery, and that Walker "went in the same direction" as the robber.

The trial took place over three days in October 2014. During jury selection, the State used six of its first eight peremptory strikes to remove African Americans from the jury, prompting Blake to raise a *Batson* challenge. Without determining whether Blake presented a prima facie case of discrimination, the court directed the State to provide its reasons for striking each of the jurors. The State offered facially race-neutral reasons for three of the challenged jurors, the court provided a facially race-neutral reason for another juror, and Blake argued that the proffered race-neutral explanation for one of the jurors was pretextual. The court denied the entire *Batson* challenge.

Trial proceeded. The State called Tina Williams, the gas station cashier, who identified Upshaw as the shooter. Blake called one witness: Jeffrey Haugabook, Upshaw's boss, who stated that on the night of the robbery, he drove Upshaw home; that they talked about the "wheat colored" Timberland boots Upshaw was wearing; that Haugabook never observed Upshaw wear purple gym shoes; and that Haugabook dropped Upshaw off at home around 3:15 or 3:20 a.m. The jury returned a guilty verdict, convicting Upshaw of armed robbery.

### C. Post-Trial State Court Proceedings

Upshaw, represented by new counsel, appealed his robbery conviction to the Court of Appeals of Michigan (COA) in December 2014. There, he raised an ineffective assistance of counsel (IAC) claim stemming from Blake's failure "to investigate potential alibi witnesses" and failure "to file the required notice of intent to present an alibi defense" under Michigan Compiled Laws § 768.20. *People v. Walker*, No. 324672, 2016 WL 2942215, at *6 (Mich. Ct. App. May 19, 2016). Upshaw also argued that the State's use of peremptory challenges to strike African American jurors violated *Batson*. *Id.* The COA rejected these claims and affirmed Upshaw's conviction. *Id.* at 10. Upshaw filed an application for leave to appeal to the Supreme Court of Michigan, which was denied. *People v. Upshaw*, 891 N.W.2d 487 (Mich. 2017). The court also denied Upshaw's request for reconsideration and remand. *See People v. Upshaw*, 895 N.W.2d 515 (Mich. 2017). The United States Supreme Court denied certiorari on November 6, 2017. *Upshaw v. Michigan*, 583 U.S. 965 (2017).

Upshaw filed a pro se motion for relief from judgment in state trial court on July 10, 2018, raising several arguments for relief, including that the Michigan COA unreasonably applied *Batson*. The trial court denied the motion on November 27.[3] The COA denied Upshaw's application for leave to appeal, and his motions for remand for a *Crosby* hearing[4] and a *Ginther* hearing,[5] on July 22, 2019. On May 26, 2020, the Michigan Supreme Court also denied Upshaw leave to appeal.

### D. Habeas proceedings

Upshaw, now represented by counsel, filed a petition for a writ of habeas corpus in federal district court on September 18, 2020, raising seven claims for relief. These included claims of ineffective assistance of trial counsel due to counsel's failure to "interview or otherwise investigate" the two alibi witnesses identified by Upshaw—"his grandmother, JoAnn Green, and his aunt, Crystal Holloway"—and a *Batson* violation due to the State's use of "6 of 8 peremptory challenges against African-American potential jurors."

At a status conference on April 12, 2022, the district court expressed that it was inclined to grant an evidentiary hearing regarding the ineffective assistance of counsel claim. The Warden filed a motion to vacate the evidentiary hearing on April 27, arguing that *Cullen v. Pinholster*, 563 U.S. 170 (2011), precluded such a hearing. The court denied the motion, and held a hearing on May 17. On July 14, 2022, the district court granted Upshaw's habeas petition, determining that he qualified for relief on his IAC and *Batson* claims. The Warden timely appealed.

---

[3]The Honorable Wanda A. Evans issued this order; Upshaw's case was transferred to her upon the retirement of the judge who presided over his trial.

[4]A *Crosby* hearing refers to a "limited remedy . . . where the trial court determines whether it would have issued a materially different sentence had the Michigan guidelines been advisory rather than mandatory at the time of the original sentencing." *Morrell v. Wardens*, 12 F.4th 626, 628 (6th Cir. 2021). The name comes from *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).

[5]A *Ginther* hearing is an evidentiary hearing that Michigan courts conduct when a defendant raises ineffective assistance of counsel claims. *See People v. Ginther*, 212 N.W.2d 922, 441-42 (Mich. 1973) ("When a defendant asserts that his assigned lawyer is not adequate or diligent or asserts, as here, that his lawyer is disinterested, the judge should hear his claim and, if there is a factual dispute, take testimony and state his findings and conclusion.").

## II.  JURISDICTION AND STANDARD OF REVIEW

Jurisdiction over this appeal is proper pursuant to 28 U.S.C. § 1291, because the district court's grant of habeas constituted a final decision.  28 U.S.C. § 2253(a).  "This Court reviews a district court's decision to grant habeas corpus relief *de novo*."  *Lancaster v. Adams*, 324 F.3d 423, 428 (6th Cir. 2003).  And "[w]e review the district court's findings of fact for clear error."  *Id.*

As to the state courts' findings of fact, "AEDPA requires federal courts to accord a high degree of deference to such factual determinations," such that "a presumption of correctness" applies "unless clear and convincing evidence is offered to rebut this presumption."  *Ferensic v. Birkett*, 501 F.3d 469, 472-73 (6th Cir. 2007) (quotations omitted); *see* 28 U.S.C. § 2254(e)(1).  To overcome this presumption, the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied."  *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).  Under such circumstances, the "federal court must then resolve the claim without the deference AEDPA otherwise requires."  *Id.*  "A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## III.  ANALYSIS

"A federal court cannot grant habeas relief unless the state court's rejection of the claim: (1) was contrary to or involved an unreasonable application of clearly established federal law, or (2) was based on an unreasonable determination of the facts."  *Bryan v. Bobby*, 843 F.3d 1099, 1105 (6th Cir. 2016).  Only "the holdings of the Supreme Court's decisions, not the dicta," determine "whether a state-court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent."  *Id.* at 1105.  The Warden appeals the district court's grant of habeas based on Upshaw's ineffective assistance of counsel and *Batson* claims. We discuss each in turn.

### A. Ineffective Assistance of Trial Counsel (IAC)

The district court's first ground for granting Upshaw habeas relief was his ineffective assistance of counsel claim. "[T]o obtain *habeas* relief for ineffective assistance of counsel, [a petitioner] must show that the state court's decision was contrary to, or an unreasonable application of, Supreme Court precedent, namely, *Strickland v. Washington*, 466 U.S. 668 (1984)." *Poindexter v. Booker*, 301 F. App'x 522, 527 (6th Cir. 2008). "[W]here there is no other Supreme Court precedent directly on point," a reviewing court applies *Strickland* "to evaluate ineffective-assistance-of-counsel claims." *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). Only rulings by the Supreme Court establish "principles of 'clearly established law'"; however, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).

The *Strickland* test has two prongs: performance and prejudice. Applying the performance prong, a reviewing court must determine whether an attorney's performance failed to meet the constitutional minimum. *See Hinton v. Alabama*, 571 U.S. 263, 273 (2014). "[P]revailing professional norms," not "best practices" or "common custom," define this constitutional standard. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 694). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A petitioner satisfies "reasonable probability" if he demonstrates "a probability sufficient to undermine confidence in the outcome." *Id.*

Many courts—including this one—"have found ineffective assistance of counsel in violation of the Sixth Amendment where . . . a defendant's trial counsel fails to file a timely alibi notice and/or fails adequately to investigate potential alibi witnesses." *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004). Citing binding Supreme Court precedent, we have emphasized that "[c]ounsel's duty to investigate has been repeatedly reaffirmed by the Supreme Court." *Poindexter*, 301 F. App'x at 528 (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); and then citing *Williams v. Taylor*, 529 U.S. 362, 399 (2000)). Though "*Strickland* does not require counsel to investigate every conceivable line" of evidence, "'strategic choices made after less

than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 690-91). Counsel's choice "not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). A choice is deemed strategic "based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation." *Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007).

"If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Pinholster*, 563 U.S. at 185. This means "that a habeas petitioner who raise[s] IAC claims in state post-conviction [cannot] rely on new evidence presented in federal court to show that the state unreasonably adjudicated his constitutional claim on the merits." *Mitchell v. Genovese*, 974 F.3d 638, 646 (6th Cir. 2020). *Pinholster* thus bars a federal court "from admitting new evidence upon which to assess the reasonableness of a state court's constitutional analysis." *Id.* at 647.

Once a petitioner "clear[s] AEDPA's procedural hurdles" of § 2254(d) on the state court record, however, a district court may hold an evidentiary hearing. *Brumfield v. Cain*, 576 U.S. 305, 324 (2015). "[I]f a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020). Stated otherwise, where an evidentiary hearing serves "as a remedy for a federal-law error that had already been found by [a reviewing court] on the basis of the record that was before the state courts, *Pinholster* does not bar consideration of the evidence introduced for the first time in the district court." *Harris v. Haeberlin*, 752 F.3d 1054, 1058 (6th Cir. 2014) (*Harris II*).

The district court here held that the state court's resolution of Upshaw's ineffective assistance of counsel claim was both an unreasonable application of *Strickland* and rested on an unreasonable determination of facts. On that basis, the court held that a federal evidentiary hearing was warranted to address this violation of federal law.

On appeal, the Warden urges that the district court erred in conducting the evidentiary hearing. In its order granting habeas relief, however, the district court emphasized that "even without the evidence from the May 17 [2022] evidentiary hearing, and even when viewed under AEDPA's deferential standard of review," Upshaw qualified for habeas relief on his IAC claim. "Based only on the record before the Michigan courts," the court explained, "it is clear that the State courts unreasonably adjudicated Upshaw's" IAC claim. Because the district court's evidentiary hearing was not necessary to resolve Upshaw's habeas claim, we decline to rely on the federal evidentiary hearing here.[6] Instead, we review the district court's decision to grant Upshaw relief on his IAC claim based on the record before the state court.

In analyzing Upshaw's IAC claim, the district court determined that "although the COA correctly identified *Strickland* as the proper standard, its application of *Strickland* was unreasonable as were its factual determinations regarding Upshaw's alibi defenses and counsel's performance." At base, this conclusion rested on the court's determination that the Michigan Court of Appeals impermissibly "collapsed *Strickland*'s two-prong inquiry into a single question focused on the strength of Upshaw's alibi testimony." Looking at the facts, the district court observed that the Michigan COA "defied common-sense in failing to consider travel time when evaluating the substance of Green's statement," because "it unreasonably assumed Upshaw could have traveled instantaneously between his home and the gas station." Uncontroverted testimony in the state court record establishes that the gas station was three and a half miles from Upshaw's residence, and Upshaw did not have a car. If Upshaw was at home with Green between 3:20 and 3:30 a.m., then it was impossible for him to make it to the gas station several miles away for the 3:37 a.m. robbery.

The Warden argues that the district court's assessment of Green's letter amounted to a legal, not a factual, determination. But the district court clarified that "it was the State court's factual determination that the witness's statement did not contain certain information that this Court found objectively unreasonable because the statement *did* contain that information." Green's statement indicated that "she was with Upshaw between 3:20 and 3:30 AM" and "that

---

[6]Because we are relying on the record before the state court exclusively, we find it unnecessary to—and decline to—determine whether the federal evidentiary hearing was proper.

she saw [Upshaw] leave the house around 7:45 AM." Yet the COA discredited Green's letter based on its conclusion that the letter did not "state that [Green] observed [Upshaw] at the exact time of the robbery." *Walker*, 2016 WL 2942215, at *6. This assessment, the district court emphasized, "defied common-sense" by not accounting for the time necessary to travel to the gas station when evaluating Green's statement.

The Warden also attempts to discount Green's letter by arguing that it does not qualify as "sworn testimony in this case," and therefore, is insufficient to support Upshaw's IAC claim. But the Warden provides no precedent articulating a basis for why these claims undermine the district court's determination. Such an approach is also unpersuasive because "no legal authority" supports the proposition "that a defendant claiming ineffectiveness of counsel based on the failure to file a timely alibi notice must produce an affidavit from the potential alibi witnesses documenting the substance of their anticipated testimony." *Clinkscale*, 375 F.3d at 444.

As the district court found, Blake's failure to investigate Upshaw's alibi witnesses, and his "failure to attempt to remedy the situation" when he missed the alibi witness deadline, constituted independent bases supporting Upshaw's ineffective assistance of counsel claim. Blake's performance, including his failure to request an adjournment to rectify the situation or request permission to file a late notice of his intent to call alibi witnesses, was, the court concluded, "not objectively reasonable," because "Blake offered no reason for his actions." The state court record alone, the district court emphasized, supports this conclusion. Determining that this "record reflects, at the very least, trial counsel's failure to investigate Upshaw's alibi defense," and that "a week before trial Blake still had not reviewed the evidence against Upshaw," the court concluded that the state court record presented "no reasonable justification for counsel's decisions." This analysis comports with our precedent. *See Ramonez*, 490 F.3d at 489 (finding counsel's performance "objectively unreasonable" where he failed to interview or make reasonable attempts to interview three known potential alibi witnesses); *Towns v. Smith*, 395 F.3d 251, 258-60 (6th Cir. 2005) (holding that counsel's failure to investigate a potential defense witness was objectively unreasonable); *Clinkscale*, 375 F.3d at 443 (same). On these bases, the district court correctly determined that the state court unreasonably applied *Strickland*.

Next, we consider prejudice. "*Strickland* instructs that 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support,'" and that "the availability of willing alibi witnesses must also be considered in light of the [weight of the other evidence] supporting [a petitioner's] conviction." *Avery v. Prelesnik*, 548 F.3d 434, 439 (6th Cir. 2008) (quoting *Strickland*, 466 U.S. at 696). Put another way, "potential alibi witnesses coupled with an otherwise weak case renders the failure to investigate the testimony sufficient to 'undermine confidence' in the outcome of the jury verdict." *Id.* In *Avery*, we affirmed the principle that a record showing counsel "never personally attempted to contact any of the potential alibi witnesses" warrants habeas relief. *Id.* at 438 (emphasis omitted). *Avery* also teaches that such failure, coupled with "the otherwise flimsy evidence supporting [a defendant's] conviction," comprised "almost entirely" of one eyewitness's testimony, justifies a grant of habeas. *Id.* at 439.

*Avery* guides the disposition of Upshaw's case. As in *Avery*, the State primarily relied on one piece of evidence to connect Upshaw to the robbery: Williams's eyewitness identification of Upshaw as the robber. Eyewitness testimony is notoriously unreliable. We have noted our "grave reservations concerning the reliability of eyewitness testimony." *Clinkscale*, 375 F.3d at 445 (quoting *Blackburn v. Foltz*, 828 F.2d 1177, 1186 (6th Cir. 1987)). Empirical studies support such concerns: a study by the Innocence Project determined that mistaken eyewitness identification arose "in approximately 69% of DNA exoneration cases, of which 77% involved multiple identification procedures (i.e., witnesses were shown a photo more than once)."[7] Case law recognizes this reality. *See Towns*, 395 F.3d at 254 (describing the prosecution's case against the petitioner as "weak" where there was "no direct evidence" and "the strongest evidence against [the petitioner] was [a single person's] eyewitness testimony, which was equivocal at best"); *Ferensic*, 501 F.3d at 482-83 (recognizing eyewitness testimony's "inherent unreliability," and emphasizing that "eyewitness misidentification is 'the single most important factor leading to wrongful convictions in the United States'") (first quoting *Watkins v. Sowders*,

---

[7] Ryanne Berube, Miko M. Wilford, Allison D. Redlich, Yan Wang, *Identifying Patterns Across the Six Canonical Factors Underlying Wrongful Convictions*, 3 Wrongful Conviction L. Rev. 166, 172 (2022) (citing *DNA Exonerations in the United States*, Innocence Project, https://innocenceproject.org/dna-exonerations-in-the-united-states/).

449 U.S. 341, 352 (1981); and then quoting *United States v. Brownlee*, 454 F.3d 131, 141 (3d Cir. 2006)).

The conclusion that the State's case against Upshaw was not overwhelming coheres with binding precedent. *See Matthews v. Abramajtys*, 319 F.3d 780, 790 (6th Cir. 2003). Stressing that "Upshaw's defense was that he had been misidentified and was elsewhere at the time of the gas station robbery," the district court concluded that Blake's failure to introduce alibi witnesses prejudiced Upshaw. The court characterized Blake's reliance on Haugabook's testimony that he dropped Upshaw off after work, and the fact that Upshaw "was wearing different shoes than those worn by the perpetrator of the armed robbery several minutes later," as "not much of a defense." This is particularly true in light of available evidence showing that "Green would have told the jury that within minutes of the robbery taking place, Upshaw was at home, with her, his aunt, his daughter, and his daughter's mother, being reprimanded by Green, and that he left the house the next morning, hours after the armed robbery occurred."[8] These conclusions were drawn from the state court record. This record reveals that the State's case "was not overwhelming," as the district court explained, because "[a]part from Williams' testimony, the State's only evidence against Upshaw was that he had been arrested for home invasion with Walker several hours after the gas station was robbed." In contrast, the other alibi witnesses that Upshaw provided but counsel ignored "could account for Upshaw's whereabouts at the time of the crime," and up until he left the home and became involved in the home invasion that resulted in his arrest.

On these facts, we conclude, like the district court, that "there is a substantial likelihood that the trial would have turned out differently if counsel had called even one alibi witness." Other factual disparities in the state court record further support this conclusion. For example, Williams testified that the masked robber wore blue sneakers and carried a gun. But Haugabook said that he never observed Upshaw "wearing purple gym shoes"—not that night, not ever, and the officer who apprehended Upshaw hours after the robbery stated that Upshaw wore tan Timberlands and did not smell like gunpowder, nor did he carry a gun or any shell casings.

---

[8]The court also observed that though "Green is now deceased, her statement is part of the record and may be considered."

No. 22-1705                          *Upshaw v. Stephenson*                          Page 13

The evidence presented at trial was not, as the Warden contends, "extremely damning."  We affirm the grant of habeas relief on Upshaw's IAC claim.

### B. *Batson* Claim

The district court also concluded that Upshaw's *Batson* claim entitled him to habeas relief.  A *Batson* challenge proceeds in three steps.  First, the party challenging the strike "must make a prima facie case that the challenged strike was based on race."  *United States v. McAllister*, 693 F.3d 572, 578 (6th Cir. 2012).  "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging" that potential juror.  *Batson v. Kentucky*, 476 U.S. 79, 97 (1986).  Last, the burden shifts back to the challenger, and the court then decides "whether the opponent of the peremptory strike has proven purposeful discrimination."  *McAllister*, 693 F.3d at 578.  Evidence of pretext can include comparator juror analysis, *see id.* at 581; differential voir dire questioning of Black and non-Black prospective jurors, *see Miller-El v. Dretke*, 545 U.S. 231, 255-56 (2005); and other evidence indicating "that discrimination may have infected the jury selection process," *Johnson v. California*, 545 U.S. 162, 172 (2005).  Each step is mandatory: "the trial court may not short circuit the process by consolidating any two of the steps."  *United States v. Kimbrel*, 532 F.3d 461, 466 (6th Cir. 2008).  If the State proceeds to give "a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination," however, "the preliminary issue of whether the defendant had made a prima facie showing becomes moot."  *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion).  The impermissible exclusion of even a single juror violates *Batson*.  *See Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).

A *Batson* challenge does not turn on the number of race-based peremptory challenges.  Rather, "the Supreme Court has directly held that even a single racially motivated peremptory strike by the prosecutor requires relief."  *Drain v. Woods*, 595 F. App'x 558, 568 (6th Cir. 2014).  Nor can the eventual empaneling of a Black juror obviate the taint of an earlier *Batson* violation.  *See Dretke*, 545 U.S. at 250.

No. 22-1705                          *Upshaw v. Stephenson*                          Page 14

The Warden challenges the district court's decision granting habeas relief under *Batson* on several grounds. He first urges that the court erred in holding that the Michigan COA unreasonably applied *Batson*. This argument rests on the contention that the Supreme Court's holding in *Hernandez* is not clearly established because it derives from a plurality opinion. Even were the step one inquiry moot, the Warden submits that Upshaw failed to meet his burden of persuasion.

At step one of the *Batson* inquiry, the challenger must make a prima facie showing that the prosecutor used her peremptory strikes to discriminate based on race. This step "becomes moot," however, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination." *Hernandez*, 500 U.S. at 359. The Warden contends that "[i]t cannot be said that a pattern of strikes against black jurors creates a prima facie case of discrimination if there is nothing more on the record from which to establish the context of those strikes." Though acknowledging "that this Court has held or implied that *Hernandez*'s mootness language is clearly established law for purposes of § 2254(d)(1)," the Warden argues that "none of those cases provided any reasoned analysis" in support of this practice.

As a threshold matter, *Hernandez* provides clearly established law. In a "fragmented" decision, the "position taken by those Members who concurred in the judgments on the narrowest grounds" controls. *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). This means that the plurality opinion, which included the mootness holding at the prima facie step, sets forth the clearly established federal law. *Hernandez*, 500 U.S. at 359. Precedent reflects this reality. First, "[t]he Supreme Court has subsequently relied upon the *Hernandez* plurality opinion in a number of cases." *Drain*, 595 F. App'x at 569-70 (collecting cases). Second, the Sixth Circuit "has previously applied *Hernandez*'s mootness holding as clearly established law." *Id.* at 570 (citing *Lancaster*, 324 F.3d at 434-35). Those prior applications are binding. *See Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004) ("We are also bound by any prior Sixth Circuit decisions concluding that federal law on a particular issue has been 'clearly established' by certain holdings of the Supreme Court."). The Warden complains that "none of those cases provided any reasoned

analysis as to . . . how the plurality opinion in *Hernandez* otherwise could be considered clearly established," but provides no authority that undermines the precedential value of those prior decisions. We decline to depart from our prior cases and the procedure set forth in the rules.

The district court correctly applied *Hernandez*'s holding in determining that because "the trial court reached step two and three of the *Batson* inquiry" the COA's decision to ground its rejection of Upshaw's *Batson* claim solely on the prima facie analysis was contrary to clearly established federal law, and appropriately reviewed Upshaw's claim de novo. Because the state trial court judge failed to rule on whether Upshaw met his prima facie burden before the State offered race-neutral reasons for its strikes, the step one inquiry is moot. *See Rice v. White*, 660 F.3d 242, 258 (6th Cir. 2011) (holding that petitioner satisfied his burden at step one "because the prosecutor proceeded to step two of *Batson* before the trial court made a ruling at step one" and proceeding to consider steps two and three). Our analysis turns to steps two and three of *Batson*.

At step two, "the State must provide race-neutral reasons for its peremptory strikes." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019). As our sister circuits have observed, "when a trial court offers its own speculation as to the prosecutor's reasons for striking minority jurors, it essentially disregards its own core function under *Batson*—to evaluate the reasons offered by the prosecutor . . . to determine the prosecutor's true intent." *Johnson v. Martin*, 3 F.4th 1210, 1224 (10th Cir. 2021). The trial court here said to "[g]o ahead" when the State asked whether it should provide its reasons for each of the challenged jurors. The State then offered reasons for the first two challenged jurors. The court then inserted its own justification for the third challenged juror, stating that the juror had "relatives in prison." The district court recognized that the state trial court's statements "impermissibly signaled to the prosecutor that this was a reason the court was prepared to find credible and never explored the prosecutor's real reason." These actions prevented the State from satisfying its burden at step two of *Batson*. By substituting its own reason for the State's, the trial court failed to fulfill its obligation to "determine whether the prosecutor's proffered reasons are the actual reasons" and to decide "whether the State was 'motivated in substantial part by discriminatory intent.'" *Flowers*, 139 S. Ct. at 2244 (quoting *Foster v. Chatman*, 578 U.S. 488, 513 (2016)).

A second issue on step two also emerged at Upshaw's trial. The Supreme Court has previously observed that the State's refusal "to respond to a trial judge's inquiry regarding [its] justification for making a strike" provides "additional support for the inference of discrimination raised by a defendant's prima facie case." *Johnson*, 545 U.S. at 171 n.6. At Upshaw's trial, neither the State—nor the court—provided reasons for striking two of the challenged jurors. After the trial judge expressed that he did not "think the *Batson* motion [could] be sustained," Blake renewed his challenge to one of the jurors whose strike the State failed to explain. The State did not respond. And the court moved on, without having the State justify the strike or conducting its own analysis as to the exclusion of this juror. Although the court failed to press the State on this point, the State's refusal to offer a race-neutral reason for striking this juror after Blake, twice, challenged her exclusion "provide[d] additional support for the inference of discrimination." *Johnson*, 545 U.S. at 171 n.6. "In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers*, 139 S. Ct. at 2241. Even if the other *Batson* issues identified above did not amount to constitutional violations, then, as explained by the district court, the State's failure to put forth any justification for excluding this juror provides grounds for relief.

The final step requires the trial court to "determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Id.* As emphasized by the Supreme Court, "[i]f any facially neutral reason sufficed to answer a *Batson* challenge, then *Batson* would not amount to much more than *Swain*," *Dretke*, 545 U.S. at 240, which imposed too onerous a burden on petitioners by requiring evidence of "systemic discrimination" by the State in jury trials, *id.* at 236. Based on this reality and the fact that "[s]ome stated reasons are false," *Batson* teaches that "a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination." *Id.* (quoting *Batson*, 476 U.S. at 96-97). Moreover, "[i]f the stated reason [for a peremptory strike] does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Id.* at 252.

Additional problems arose at step three. The trial court stated: "Well, the Prosecutor has given some explanation other than race being challenged. I don't think the *Batson* motion can be

sustained. I don't have any further comments on whether it's good or bad. That's the strategy of a trial." The district court characterized this assessment as "the court summarily conclud[ing] that there had been no discrimination purely because 'the Prosecutor . . . gave *some* explanation other than race being challenged.'" The record corroborates this characterization. Nowhere in the transcript does the trial court consider, implicitly or explicitly, "the persuasiveness of the prosecutor's justification for [her] peremptory strike." *Cockrell*, 537 U.S. at 338-39. Instead of properly considering the validity and adequacy of the State's reasons, the trial court asked whether the State provided any explanation. That is not the appropriate inquiry. And this inquiry is critical: if it reveals that "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Dretke*, 545 U.S. at 241.

Although the State claimed that it struck an older Black woman from the jury due to her age, not her race, it empaneled three other retired nonblack women. This raises the probability that the State's race-neutral explanation for striking the juror was pretextual. *See McAllister*, 693 F.3d at 581-82 (citing comparator analysis between excluded and impaneled jurors as reflecting "a failure on the part of the district court . . . to conduct a constitutionally sufficient *Batson* analysis" to "definitively resolv[e] these issues"). The State's argument that Upshaw failed to meet his burden of persuasion misses the mark because it fails to account for these violations of *Batson*'s process.

"[T]he job of enforcing *Batson* rests first and foremost with trial judges." *Flowers*, 139 S. Ct. at 2243. Because "America's trial judges operate at the front lines of American justice," they also "possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process." *Id.* Here, the Michigan Supreme Court had previously warned Upshaw's trial judge that his handling of a *Batson* challenge, which included the judge's observation that he was "not going to . . . indulge in . . . race baiting," could justify a judicial misconduct investigation. *Pellegrino v. AMPCO System Parking*, 785 N.W.2d 45, 49 (Mich. 2010). As shown by the state court record, at Upshaw's trial, the judge failed to properly

apply *Batson* in multiple respects.  On review, Michigan's appellate courts failed to apply clearly established Supreme Court precedent and remedy these violations.

AEDPA requires "federal judges to attend with the utmost care to state-court decisions." *Williams v. Taylor*, 529 U.S. 362, 386 (2000).  It does not, however, "require the federal courts to cede" to state courts their "independent responsibility . . . to interpret federal law." *Id.* at 379. This function is critical in the context of jury service, recognized as one of "the most substantial opportunit[ies] that most citizens have to participate in the democratic process." *Flowers*, 139 S. Ct. at 2238.  A federal court acts within its discretion when it "say[s] what the law is" and corrects state courts' unreasonable application of clearly established federal law.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  We affirm the district court's grant of habeas on Upshaw's *Batson* claim.

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment granting Upshaw habeas relief on both his IAC and *Batson* claims.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-1705

LAFAYETTE DESHAWN UPSHAW,

    Petitioner - Appellee,

    v.

GEORGE STEPHENSON, Warden,

    Respondent - Appellant.

> **FILED**
> Mar 28, 2024
> KELLY L. STEPHENS, Clerk

Before:  MOORE, GIBBONS, and STRANCH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Kelly L. Stephens, Clerk